# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3788

_____

| | | |
|---|---|---|
| Archer Daniels Midland Company, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Aon Risk Services, Inc. of Minnesota, | * | |
| formerly known as Rollins Burdick | * | |
| Hunter of Minnesota, Inc., formerly | * | |
| known as Rollins Hudig Hall of | * | |
| Minnesota, Inc., | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: November 17, 2003

Filed: January 21, 2004

_____

Before MURPHY, LAY, and FAGG, Circuit Judges.

_____

LAY, Circuit Judge.

Archer Daniels Midland Company ("ADM") filed suit against Aon Risk Services, Inc. of Minnesota ("Aon"), its insurance broker, alleging breach of contract, breach of fiduciary duty, and negligence due to Aon's failure to obtain contingent business interruption and extra expense insurance coverage as requested by ADM.

The jury returned a verdict in favor of ADM. Aon appeals, asserting several errors. We affirm.

## I. BACKGROUND

ADM, a Delaware corporation with its principal place of business in Illinois, processes and markets a variety of agricultural commodities such as corn, wheat, and soybeans. ADM uses corn to make such products as high-fructose corn syrup ("HFCS") and ethanol. Aon, a Minnesota corporation with its principal place of business in Minnesota, is an insurance broker who acts as an intermediary between insurance companies and its clients in trying to place insurance coverage for those clients.

Beginning in 1983, ADM established a property-insurance program known as the "difference-in-conditions" ("DIC") program. The DIC program was a "layered" program covering all risks of property loss that were not specifically excluded. Under this program, multiple insurers provided different layers of coverage totaling $100 million. The first five layers of coverage were in the amount of $5 or $10 million each. The final layer was a $50 million excess layer that would be penetrated only if the underlying insurers had to pay their $50 million in coverage.

Each insurer in the DIC program provided coverage under the same terms, which were found in the DIC policy specifically drafted for ADM. The policy provided traditional property-insurance coverages and also included coverages for contingent business interruption and extra expense.[1]

---

[1]These coverages were found in Section 13Q, which provided as follows:

Contingent Business Interruption and Extra Expense[:] This policy covers against loss of earnings and necessary extra expense resulting from necessary interruption of [ADM's] business . . . caused by damage

Aon became ADM's insurance broker for the DIC program in 1988. For the 1992-93 policy period, ADM instructed Aon to renew coverage in the DIC program under the terms of the DIC policy but to obtain coverage for the $50 million excess layer from a new insurer because the previous insurer's premium increase was unacceptable. Aon procured coverage for the $50 million excess layer from Hartford Fire Insurance Company ("Hartford"). However, Aon failed to include contingent business interruption and extra expense insurance coverage in the Hartford policy, an omission that forms the basis of the case leading up to this appeal.

In 1993, flooding occurred in many parts of the Mississippi River system, which negatively impacted the Midwestern corn crop for that year and hampered the ability to move products by barge on the river. ADM claimed the flood caused it to incur extra expense in order to procure sufficient quantities of corn for its processing. ADM also claimed prolonged closures of parts of the Mississippi and Illinois Rivers caused it to lose income and incur additional expense as it sought alternative means of transportation. ADM ultimately submitted claims to its insurers for losses from the flood totaling more than $166 million. ADM believed the contingent business interruption and extra expense coverages applied to a substantial amount of these losses since Midwestern farmers, who were unable to provide sufficient corn, and the U.S. Government, which operated the Mississippi River system, were two of ADM's suppliers.

ADM's insurers, other than Hartford, paid approximately $10.7 million to ADM for damage to its property and certain other losses caused by the flood. The insurers denied payment on ADM's claims for contingent business interruption and

to or destruction of real or personal property, by the perils insured against under this policy, of any supplier of goods or services which results in the inability of such supplier to supply [goods or services to ADM].

extra expense, concluding those coverages did not apply because Midwestern farmers and the U.S. Government were not "any supplier."

ADM filed suit against the DIC program insurers, including Hartford, in federal court in Illinois alleging the contingent business interruption and extra expense coverages provided under their policies extended to ADM's lost income and extra expense incurred as a result of the flood's damage to Midwestern farmers and the U.S. Government. ADM and the insurers (other than Hartford) eventually settled for $23.5 million.[2] The district court granted Hartford's motion for partial summary judgment on September 9, 1997, finding that Hartford's policy insured only against direct physical damage to ADM's insured property.

Thereafter, ADM filed suit against Aon on September 25, 1997, alleging breach of contract, breach of fiduciary duty, and negligence, and seeking $50 million in damages for Aon's failure to secure contingent business interruption and extra expense coverages in the Hartford policy. Aon moved to dismiss on the grounds that ADM could not seek to recover from Hartford (or, therefore, Aon) in the $50 million excess layer because it had not exhausted the underlying $50 million layers. The district court[3] denied the motion, holding that ADM had exhausted the lower layers by agreeing to settle with the underlying insurers for a partial sum and absorbing the balance of the $50 million.

---

[2]Prior to settlement, the district court held that Midwestern farmers and the U.S. Government were within the scope of the "any supplier" language of the contingent business interruption and extra expense coverages. Archer-Daniels-Midland Co. v. Phoenix Assurance Co. of New York, 936 F. Supp. 534, 544 (S.D. Ill. 1996).

[3]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

Prior to trial, the district court entered orders excluding evidence that ADM "passed on" its extra corn expense to its consumers by raising prices and that ADM continued to produce ethanol during the period following the flood even though it was losing money on this production. The district court also excluded evidence proffered by one of Aon's expert witnesses that ADM could have maximized profit and minimized loss by switching production from ethanol to HFCS. In addition, the district court prohibited Aon from introducing evidence concerning allegations of price-fixing by ADM in the HFCS market.

A jury trial began on March 4, 2002. Since Aon admitted negligence during its opening statement, the trial primarily focused on damages. ADM introduced evidence of the extra expense it incurred in obtaining suitable corn for production of ethanol and HFCS. Aon offered expert testimony to refute ADM's evidence and argued that ADM's alleged losses were offset by ADM's use of hedging, a program by which ADM would buy and sell commodity futures in order to minimize loss due to price fluctuation. According to Aon, the expert ADM used to present evidence of its increased corn costs did not take hedging into account in his analysis of ADM's total corn costs. On April 15, 2002, the jury returned a $16.5 million verdict in favor of ADM. The district court entered judgment in favor of ADM on April 17, 2002.

Aon then moved for a new trial, judgment as a matter of law, and a stay of execution of judgment. The district court denied Aon's post-trial motions and awarded ADM $3.6 million in prejudgment interest. On appeal, Aon argues that the district court erred in denying its motions for judgment as a matter of law or a new trial and in awarding ADM $3.6 million in prejudgment interest.

## II. DISCUSSION

### A. *Choice of Law*

We first address Aon's contention that the district court should have construed the DIC policy under Illinois law rather than Minnesota law. "In a diversity case, a federal court applies the choice of law rules of the forum state." Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997). The first consideration under Minnesota's choice of law rules is whether an actual conflict exists between the laws of the different states. Jepson v. Gen. Cas. Co. of Wis., 513 N.W.2d 467, 469 (Minn. 1994). If the choice of one state's laws over the other does not create an actual conflict, there is no choice of law issue to be decided. Vetter v. Sec. Cont'l Ins. Co., 567 N.W.2d 516, 521-22 (Minn. 1997).

In concluding that it correctly applied Minnesota law, the district court pointed out that Aon failed to demonstrate that a conflict exists between the legal principles and standards applicable to contract interpretation, negligence, or breach of contract and fiduciary duty under Minnesota and Illinois law. Thus, there was no choice of law issue for the district court to decide. Id. at 522. We conclude the relevant legal principles concerning the district court's interpretation of the DIC policy are the same in both states.

### B. *Business Interruption*

On appeal, Aon argues that ADM cannot recover contingent extra expense under Section 13Q because it did not suffer any business interruption as a result of the flood. Aon asserts that under Section 13Q, ADM was required to establish that it actually ceased production at its plants in order for the extra expense coverage to apply. Because ADM failed to prove this element of its case, Aon claims it is entitled to judgment as a matter of law.

Although Aon couches its argument in terms of a failure of proof, the crux of its argument is that the district court incorrectly interpreted the meaning of the phrase "interruption of business" as used in Section 13Q. Because the district court provided the meaning of "interruption of business" in a jury instruction, ADM argues we must review the issue for an abuse of discretion. See Warren v. Prejean, 301 F.3d 893, 900 (8th Cir. 2002) (stating that a district court's jury instructions are reviewed for an abuse of discretion). However, the district court fashioned its jury instruction based on an interpretation of the DIC policy. All issues related to the district court's interpretation of an insurance policy present questions of law, which we review *de novo*. United Fire & Cas. Co. v. Fid. Title Ins. Co., 258 F.3d 714, 718 (8th Cir. 2001).

An insurance policy is a contract, the terms of which must be construed in the context of the entire contract. Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1212 (Ill. 1992); Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 652 (Minn. 1986); Employers Mut. Liability Ins. Co. of Wisc. v. Eagles Lodge of Hallock, Minn., 165 N.W.2d 554, 556 (Minn. 1969). In construing an insurance policy, the court's overriding concern must be to ascertain the intent of the parties based on the language of the whole policy. Outboard Marine, 607 N.E.2d at 1212; Bobich v. Oja, 104 N.W.2d 19, 24 (Minn. 1960); Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 151 (Minn. Ct. App. 2001). Unambiguous language in the insurance policy must be given its plain and ordinary meaning, but any ambiguities in the policy's language will be construed in favor of the insured. Outboard Marine, 607 N.E.2d at 1212; Henning, 383 N.W.2d at 652; Bobich, 104 N.W.2d at 24.

The district court interpreted the phrase "interruption of business" as applied to the extra expense coverage in Section 13Q as follows:

The phrase "interruption of business," as used in section 13Q of the DIC policy, does not require ADM to show that its corn processing plants stopped or slowed production. An interruption of business means some harm to the insured's business, including the payment of extra expense, that would not have been incurred but for damage that an insured peril has caused to the property of any supplier.

In our view, the district court's interpretation of the phrase "interruption of business" as applied to the extra expense coverage of Section 13Q is based on the language of the policy as a whole and correctly embodies the parties' intent.

Section 13Q of the DIC policy insures against loss of earnings and extra expense incurred as a result of a necessary interruption of business. The loss of earnings and extra expense coverages provided by Section 13Q are separate and distinct, and, as discussed below, they mirror the coverages provided in other sections of the policy.

The DIC policy sets forth the terms of coverage for extra expense in Section 10. Section 10B defines "extra expense" as "the excess, if any, of the total cost . . . chargeable to the conduct of the insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no peril insured against and not excluded occurred." Section 10B specifically excludes from the definition any "extra expense in excess of that necessary to continue as nearly as practicable the normal conduct of the insured's business." Because the definition of extra expense contained in Section 10B applies wherever the term is used in the DIC policy, it applies to the extra expense coverage provided by Section 13Q.

As defined in Section 10B, extra expense clearly includes those expenses necessary to *carry on* business operations.[4] Section 10B would not make any sense if the DIC policy were interpreted as covering only the extra expense incurred as a result of a complete cessation of business. Accordingly, Aon's argument that the policy only covers extra expense if business operations were stopped is inconsistent with the terms of the policy.

The district court's determination that ADM need not have stopped or slowed production in order to recover extra expense under Section 13Q is further supported by the policy's terms of coverage for loss of earnings, which are set forth in Section 9 of the DIC policy under the title "Loss of Income." Under this section, the DIC policy provides loss of income coverage "in the event the insured is wholly or partially prevented from producing goods or from continuing business operations or services" and cannot "make up lost production within a reasonable period of time . . . or continue business operations or services" through the use of other property or service or by working extra time or overtime. In this situation, the policy covers the actual loss of gross earnings sustained "during the period of interruption of production or suspension of business operations."

With respect to loss of earnings coverage under Section 13Q, the district court ruled that a shutdown or cessation of business was required. Aon contends there is no justification for the district court's interpretation of "interruption of business" under Section 13Q as requiring a shutdown for loss of earnings coverage but not requiring one for extra expense coverage. However, contrary to Aon's argument, the district court's interpretation of "interruption of business" for loss of earnings

---

[4]In proceedings before the magistrate judge in this case, Aon's counsel affirmed such an interpretation, stating "[u]nder extra expense, the insurance company will pay you, as the insured, whatever extra money you had to put out to keep yourself in business so that you could continue on rather than shut down." (Appellee's App. at AA514.)

-9-

coverage under Section 13Q is consistent with the DIC policy. Unlike Section 10, Section 9 specifically requires a suspension of operations before loss of earnings coverage can apply. The absence of a similar limitation in Section 10 is evidence of the parties' intent not to limit extra expense coverage in that manner.

To support its position that the phrase "interruption of business" requires a cessation of business, Aon relies primarily on Butwin Sportswear Co. v. St. Paul Fire & Marine Insurance Co., 534 N.W.2d 565 (Minn. Ct. App. 1995). We find Butwin inapposite because the policy at issue there specifically required a suspension of operations before the insured could recover extra expenses. Id. at 567. Likewise, other cases Aon cites are not persuasive for the same reason or because they do not involve extra expense coverage. See Winters v. State Farm Fire & Cas. Co., 73 F.3d 224, 229 (9th Cir. 1995) (policy required a suspension of operations); Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co. of Am., 835 F.2d 812, 813 (11th Cir. 1988) (involving loss of earnings coverage); Am. States Ins. Co. v. Creative Walking, Inc., 16 F. Supp. 2d 1062, 1063-64 (E.D. Mo. 1998) (policy required a suspension of operations and covered extra expense to avoid or minimize a suspension); Rothenberg v. Liberty Mut. Ins. Co., 153 S.E.2d 447, 448 (Ga. Ct. App. 1967) (involving loss of earnings coverage); Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co., 227 N.W.2d 789, 794 (Minn. 1975) (same); Quality Oilfield Prods., Inc. v. Michigan Mut. Ins. Co., 971 S.W.2d 635, 639 (Tex. Ct. App. 1998) (involving loss of income coverage); Keetch v. Mut. of Enumclaw Ins. Co., 831 P.2d 784, 785 (Wash. Ct. App. 1992) (involving loss of earnings coverage).

The cases cited by both parties demonstrate that parties to an insurance contract can require a slowdown or cessation of business before extra expense coverage applies. The DIC policy, however, does not include such a requirement with respect to the extra expense coverage of Section 13Q, and we are not at liberty to rewrite the policy to include one. See Polychron v. Crum & Forster Ins. Cos., 916 F.2d 461, 463 (8th Cir. 1990). Accordingly, we hold that the district court did not err in its

interpretation of the phrase "interruption of business" as applied to the extra expense coverage of Section 13Q.

## C. Evidentiary Rulings

Aon challenges three of the district court's evidentiary rulings. We review each ruling for an abuse of discretion, bearing in mind that the district court has substantial discretion in admitting or excluding evidence and its decision will not be overturned unless it affects the substantial rights of the challenging party. Bennett v. Hidden Valley Golf & Ski, Inc., 318 F.3d 868, 878 (8th Cir. 2003).

### 1. Exclusion of Evidence that ADM Passed On Its Extra Corn Expense

Aon argues the district court erred by excluding all evidence that ADM passed on its extra corn expense to its customers in the form of higher prices. Aon claims exclusion of this evidence prevented it from showing that ADM did not suffer any net shortfall as a result of the extra corn expense incurred in the production of HFCS. To the contrary, Aon claims that ADM actually made a $51 million profit on HFCS sales in the year of the flood. Aon also claims the district court's ruling allowed ADM to recover a windfall, which is inconsistent with the district court's jury instruction that any damages awarded should make ADM whole but not provide it with a windfall profit.

ADM argues the district court correctly excluded evidence related to Aon's "pass on" theory because the DIC policy covers extra expenses without offset for profits or sales revenues. ADM claims that because the loss of earnings and extra expense coverages in Section 13Q are separate coverages, there is no basis for Aon's argument that contingent extra expense is tied to lost earnings or limited by lost earnings avoided. We agree.

The DIC policy does not state that ADM's extra expense recovery must be limited by or measured against its profits or sales. In fact, the formula for measuring extra expense under the DIC policy merely requires calculating the difference between the costs incurred and the costs that would have been incurred during the same period had no insured peril occurred. If the parties intended to limit extra expense coverage by reference to earnings or profits, they could have provided such a limitation in the language of the policy.

Admitting evidence that ADM passed on its extra corn expense to customers would have been contrary to the plain language of the DIC policy. Accordingly, we find that the district court did not abuse its discretion in excluding the evidence. We also reject Aon's contention that exclusion of this evidence allowed ADM a windfall recovery. Because the DIC policy did not require extra expense coverage to be measured against profits or revenues, there could be no impermissible windfall where extra expense damages were awarded based on the formula set forth in the policy.

## 2. Admission of Expert Testimony

Aon next argues the district court erred in admitting the testimony of ADM's damages expert, Dr. Bruce Scherr, because Dr. Scherr's testimony did not take into account the impact of hedging on ADM's total corn costs and, therefore, did not incorporate all aspects of the economic reality of ADM's total corn cost. Essentially, Aon contends Dr. Scherr's failure to consider the impact of hedging meant that he was not qualified to testify about ADM's total corn costs in the year of the flood or the corn costs ADM normally would have incurred if the flood had not taken place.

We review a district court's decision to admit expert testimony for an abuse of discretion. Hartley v. Dillard's, Inc., 310 F.3d 1054, 1060 (8th Cir. 2002). "Expert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue." Id.; see also Fed. R. Evid. 702. An expert need not have

an opinion on an ultimate issue of fact in order for the testimony to be admissible. Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001). Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility. Id. An expert's opinion must be excluded only if it "is so fundamentally unsupported that it can offer no assistance to the jury." Id. at 929-30 (quoting Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1996)).

Dr. Scherr's testimony was relevant for determining ADM's extra corn expense in the year of the flood. His testimony explained that the 1993 flood caused the market price of corn to increase by about twenty-five cents per bushel, which caused ADM to incur $113 million in extra expenses for corn. His testimony was based on reliable data from the United States Department of Agriculture. Although Dr. Scherr did not factor hedging into his analysis, his testimony was reliable and would assist the jury in determining ADM's extra corn expense for the year of the flood. On this basis, we conclude the district court did not abuse its discretion in admitting the testimony of Dr. Scherr.

### 3. Exclusion of Evidence that Certain Expenses were Unnecessary

Aon's final evidentiary challenge relates to the district court's exclusion of evidence that $72 million of ADM's extra expenses were unnecessary. The expenses related to ADM's production of ethanol. Aon sought to introduce testimony that ADM should have produced fewer gallons of ethanol in the year of the flood and "swung" its capacity to HFCS instead in order to reduce its extra corn expense. We conclude that the district court did not abuse its discretion by excluding this evidence. Aon was permitted to introduce other evidence that ADM's extra corn expenses were unnecessary. As the district court found, the evidence Aon sought to introduce was

not relevant because nothing in the DIC policy permitted an insurer to challenge the rationality of ADM's ethanol production decisions.[5]

*D. Growing Crops Exclusion*

Aon contends the district court erroneously concluded that the "growing crops" exclusion of the DIC policy only applied to crops grown by ADM. In contrast to the district court's conclusion, Aon argues the exclusion applies to crops grown by farmers who supplied corn to ADM through local and county grain elevators. Because this issue involves the district court's interpretation of the DIC policy, we apply a *de novo* standard of review. United Fire & Cas. Co., 258 F.3d at 718.

Section 5 of the DIC policy sets forth the scope of ADM's property covered under the policy. Section 7 of the policy specifies what property is excluded from coverage, including land, trees, plants, and growing crops. The coverages provided in Section 13Q, however, apply to the "real or personal property . . . of any supplier." Having reviewed the policy as a whole, we conclude the exclusions in Section 7 apply only to limit the property covered by Section 5 and do not apply to Section 13Q. Section 13Q does not reference any exclusions or other limitations on the scope of the suppliers' property that is covered. In contrast, Section 5 specifically provides that ADM's property is covered "except as herein excluded." Therefore, the district court did not err in concluding that the growing crops exclusion contained in Section

_____

[5]On appeal, Aon claims it is entitled to judgment as a matter of law because ADM failed to prove that its extra corn expenses were necessary. The parties dispute whether this issue was properly preserved for appeal. Whether or not the issue was properly preserved, we find no merit in Aon's argument. The DIC policy provides coverage for extra expenses necessary to continue as nearly as practicable the normal conduct of ADM's business operations. We conclude ADM produced sufficient evidence that the extra corn expenses were necessary to continue normal operations.

7 applies only to claims involving ADM's property and not to claims involving the property of ADM's suppliers.

*E.  Exhaustion of Underlying Policy Limits*

Aon argues ADM cannot recover under the excess insurance layer of the DIC policy because it has not exhausted the underlying layers.  The district court rejected the argument based on its conclusion that ADM's decision to settle with the underlying insurers for less than the full $50 million meant ADM had exhausted the lower layers. Aon claims this ruling was error.[6]

The district court provided a thorough and well-reasoned analysis to support its conclusion that ADM's decision to settle for less than the underlying $50 million limit and absorbing the balance did not preclude ADM from pursuing coverage under the excess layer. The district court relied on Drake v. Ryan, 514 N.W.2d 785, 789 (Minn. 1994), in determining that "exhaustion" did not mean that ADM must have collected every dollar of the underlying coverages and that settlement with the underlying insurers does not absolve an excess insurer from liability. The district court also distinguished other Illinois and Minnesota cases relied upon by Aon to support its position.  Having reviewed the issue, we conclude that the district court did not err in concluding ADM was not precluded from seeking recovery under the excess layer.

---

[6]We note that throughout this appeal the parties consistently have focused their arguments on the terms of the DIC policy. However, Aon now contends this issue must be resolved under the terms of the policy ADM had with Employers Insurance of Wausau ("Wausau") the year before Aon secured the Hartford policy.  However, we, like the district court, conclude the DIC policy is the only policy relevant to this appeal.

*F. Prejudgment Interest*

Aon argues the district court erred in its award of prejudgment interest. Under Minnesota's prejudgment interest statute, the interest on pecuniary damages generally is calculated from the date the action is commenced until the date of the verdict. Minn. Stat. § 549.09, subd. 1(b) (2002). An exception to the general rule is the offer-counteroffer provision of the statute. Under this exception, "[i]f either party serves a written offer of settlement, the other party may serve a written acceptance or a written counteroffer within 30 days." Id. If the losing party makes a written settlement offer

> closer to the judgment or award than the prevailing party's offer, the prevailing party shall receive interest only on the amount of the settlement offer or the judgment or award, whichever is less, and only from the time of commencement of the action . . . until the time the settlement offer was made.

Id.

On September 5, 2001, Aon's counsel sent a letter addressed to Judge John Tunheim and Magistrate Judge Raymond Erickson concerning a settlement conference between the parties scheduled for September 7, 2001. In the letter, Aon's counsel stated that its settlement position remained unchanged and that Aon was willing to settle the case based on the cost of taking it through trial and the appellate process, which Aon estimated to be approximately $1.5 million. The letter suggested that the settlement conference may be unnecessary given the parties' unchanged positions. A copy of the letter was sent to ADM's counsel.

Aon claims the September 5, 2001 letter constituted a written offer of settlement under § 549.09. Because ADM never submitted a written settlement offer,

-16-

Aon asserts its offer was closer to the final judgment and ADM is entitled to interest only from September 27, 1997, through September 5, 2001.

The district court never specifically addressed whether Aon's letter fell within the offer-counteroffer exception, even though both parties argued the issue before the district court. The district court merely stated that Aon's settlement offers were not in writing and were, therefore, invalid for purposes of § 549.09. The parties dispute the standard of review to be applied to this issue. Because we hold the district court's determination that neither of Aon's settlement offers were valid necessarily involved an interpretation of Minnesota's prejudgment interest, we review the issue *de novo*. See Transit Cas. Co. v. Selective Ins. Co. of Southeast, 137 F.3d 540, 543 (8th Cir. 1998) (stating district court's interpretation of state law is reviewed *de novo*); Grab v. JanSport, Inc., 466 N.W.2d 762, 764 (Minn. Ct. App. 1991).

In order for an offer to be valid under § 549.09, it "must be in writing and must offer, in sufficiently clear and definite terms, to dispose completely the claims between the negotiating parties." Hodder v. Goodyear Tire & Rubber Co., 426 N.W.2d 826, 840 (Minn. 1988). The offer must be served on the other party. Grab, 466 N.W.2d at 764. The statute's aim of promoting settlement "is best accomplished by offers which are straightforward and would in an effective and practical manner settle matters between the negotiating parties." Hodder, 426 N.W.2d at 840.

We believe Aon's argument that the September 5, 2001 letter is a valid settlement offer puts form over substance. See Buysse v. Baumann-Furrie & Co., 498 N.W.2d 289, 294 (Minn. Ct. App. 1993) (rejecting the argument that a court-imposed stipulation amounted to an offer within meaning of § 549.09). The true intent of the letter was to advise the district court that the September 7, 2001 settlement conference might be a needless expenditure of the court's time since neither party was willing to budge from their respective settlement positions. The letter was directed to the district court, not ADM, and specifically asked *the court* for direction as to whether

-17-

the court wished to proceed with the settlement conference. The mere fact that Aon recited its willingness to settle for $1.5 million does not convert the letter into an offer. It is clear from the letter that Aon included this information to support its suggestion that the settlement conference would be a waste of the court's time. In our view, the letter cannot be construed as a "straightforward" offer that would invite ADM's acceptance or rejection or provide an effective means of settling the dispute. On this basis, we conclude that the September 5, 2001 letter was not a "written offer of settlement" as contemplated by § 549.09, and the district court did not err in its award of prejudgment interest.

## III. CONCLUSION

For the reasons set forth in this opinion, we affirm the judgment of the district court.

_____