# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01454-SCT

*FRANKLIN CORPORATION*

*v.*

*PAULINE TEDFORD, LORA SMITH, JUDY*
*HAIRE AND SAMANTHA MIXON*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 07/26/2007 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | CALHOUN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES LAWTON ROBERTSON |
| | JENNIFER HUGHES SCOTT |
| | ELIZABETH G. HOOPER |
| | BRIDGET E. KOBS |
| ATTORNEYS FOR APPELLEES: | HEBER S. SIMMONS, III |
| | WILLIAM MELVIN ROSAMOND |
| | DOUGLAS G. MERCIER |
| | JOHN ROBIN BRADLEY, JR. |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 09/10/2009 |
| MOTION FOR REHEARING FILED: | 05/14/2009 |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing filed by Franklin Corporation is denied. The previous

opinions of this Court are withdrawn and these opinions are substituted therefor.

¶2.     Today we are presented with the latest conflict in the ongoing legal struggle between

industry and labor regarding compensation and medical indemnity for employees injured in

the workplace. The appellees/employees seek to expand the scope of egregious conduct excluded from the Mississippi Workers' Compensation Law ("Act") to include acts which are "substantially certain" to cause injury to the employee. Not surprisingly, the appellant/employer clamors for the opposite, requesting that this Court overrule *Miller v. McRae's, Inc.*, 444 So. 2d 368 (Miss. 1984), and its progeny and retreat from these decisions, which exclude employers' tort immunity for certain egregious acts accompanied by an "actual intent to injure" the employee. After due consideration and deliberation, this Court chooses to do neither. The constitutionally delineated forum for change is the Mississippi Legislature, not this Court. We find that the correct balance is in place and so shall remain, unless the Legislature should decide otherwise.

¶3.　In the case *sub judice*, Pauline Tedford, Lora Smith, Judy Haire, and Samantha Mixon ("Plaintiffs") filed suit alleging multiple claims against multiple defendants, including claims against their employer, Franklin Corporation, for battery and intentional infliction of emotional distress arising from injuries sustained in the course and scope of their employment. Franklin Corporation filed a "Motion to Dismiss" and a "Motion for Summary Judgment," contending that the exclusive remedy for the Plaintiffs was provided by the Act. After due consideration by the circuit court, the trial judge denied the relief sought and set the matter for trial. At trial, the jury found in favor of the Plaintiffs, awarding both compensatory and punitive damages. Thereafter, the circuit court denied Franklin Corporation's "Motion for J.N.O.V., or in the Alternative, for New Trial or Remittitur," but reduced the punitive damage award. From those rulings, Franklin Corporation appeals.

2

**HISTORICAL BACKGROUND**

¶4.    The demand of labor for the protection of workers' compensation laws is well-established.  *See* O.W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 466-67 (1897) ("[s]ince the last words were written, I have seen the requirement of such insurance put forth as part of the programme of one of the best known labor organizations.").  This was largely in response to the denial of employer indemnity in the majority of workplace accidents, due to the lack of proof of employer fault[1] or employer defenses such as contributory negligence, assumption of risk, and the fellow-servant rule.  *See* Downey, *History of Work Accident Indemnity in Iowa* at 5, 17, 78.  The prevailing view of labor was that:

> [a]n indemnity system which tediously grinds out such results as these is no better than a gamble – a gamble which awards a few prizes to injured persons and deludes all other injured persons into thinking they are going to draw prizes, too, when, as a matter of fact, they are going to draw blanks; a gamble which makes the employer pay preposterous sums to certain people and so prevents him from paying reasonable sums to all.  It is on the same level as faro.

*Id*. at 80 (internal quotation marks omitted).  *See also* P.V. Fishback & S.E. Kantor, *A Prelude to the Welfare State: The Origins of Workers' Compensation*, 11 (University of Chicago 2000) ("[r]eformers decried the common law system" for uncompensated injuries, "uncertain and unequal payouts," high transactional costs, and delay).  By the early 1900s, President Theodore Roosevelt included "comprehensive workmen's compensation acts"

---

[1] For example, "[e]very mechanical employment has a predictable hazard: of a thousand men who climb to dizzy heights in erecting steel structures a certain number will fall to death, and of a thousand girls who feed metal strips into stamping machines a certain number will have their fingers crushed." E.H. Downey, *History of Work Accident Indemnity in Iowa* 5 (Benjamin F. Shambaugh, ed., State Historical Society of Iowa 1912).

within his progressive program for economic reform, the "Square Deal." T. Roosevelt, *The New Nationalism* (Aug. 31, 1910), in 13 *The Annals of America* 250, 253 (Encyclopedia Britannica, Inc. 1976).

¶5. The subsequent "advent of state workers' compensation laws after 1910 marked the removal from the tort system of most suits by injured workers against employers." Note, *Exceptions to the Exclusive Remedy Requirements of Workers' Compensation Statutes*, 96 Harv. L. Rev. 1641, 1641 (1983). In fact, "[b]etween 1911 and 1920, 41 states enacted workers' compensation statutes." *Id*. at 1641 n.1 (citing E.H. Downey, *Workmens' Compensation*, 162 n.18 (1924)). Initially, some courts deemed such statutes to be so radical as to constitute an unconstitutional deprivation of the employer's property without due process of law. *See **Ives v. South Buffalo Ry.***, 201 N.Y. 271, 94 N.E. 431 (1911); J.C. Satterfield, *An Introduction to the Mississippi Workmens' Compensation Act*, 20 Miss. L.J. 27, 31 (1948) ("three of the four acts adopted prior to 1911 were declared unconstitutional . . ."). However, after their widespread acceptance had been established:

> Mississippi became the last state to adopt a system of Workmen's Compensation. This type of legislation is generally viewed as a compromise between the interest of labor and business. Because of the exclusive nature of the remedy labor surrenders the right to assert a common law tort action along with the attendant possibility of achieving punitive damages. In exchange it receives assurance that an award is forthcoming. Industry surrenders its three major common law defenses: contributory negligence, assumption of risk, and the fellow servant rule. In exchange it receives the knowledge that there will be no outrageously large judgments awarded to injured employees.[2] The

---

[2]The mutual benefit of the workers' compensation system in Mississippi was described as follows:

both the employers and employees will be materially benefitted by this

entire system was designed to insure that those injured as a result of their employment would not be reduced to a penniless state and thereby become dependent on some form of governmental public assistance.

*Miller*, 444 So. 2d at 370. *See also **Stevens v. FMC Corp.***, 515 So. 2d 928, 932 (Miss. 1987) (quoting ***Sawyer v. Head***, 510 So. 2d 472, 477 (Miss. 1987)) ("[b]y the exchange, the remedy of workers' compensation benefits, insofar as the right of the employee against [the] employer and fellow employees are concerned, is abrogated."); John R. Bradley & Linda A. Thompson, *Mississippi Workers' Compensation* § 1:1 (2007) ("[t]hus, compensation by the employer for most employment injuries has been taken out of the tort law and placed within a separate branch of law – worker's compensation, a no-fault plan[3] handled in an administrative setting by an executive branch agency."). Ultimately, the workers' compensation system lends valuable predictability to both employees and employers. Employees receive guaranteed compensation for covered injuries, bypassing the civil-litigation risks of either no recovery or uncollectible judgments against insolvent employers.

---

legislation. The psychological effect upon industries coming into Mississippi is good, and it appears that the employers on the average will reap a financial saving and the employees a financial benefit. On the whole the Act is fair and workable, and compares favorably with the statutes now in existence in the other states.

Satterfield, *An Introduction to the Mississippi Workmens' Compensation Act*, 20 Miss. L.J. at 48.

[3]These "no-fault" aspirations of the Act have been largely met, as statistics from 2007 reveal that more than seventy-eight percent of lost-time cases in Mississippi are uncontested. *See* Mississippi Workers' Compensation Commission, *Annual Report Cumulative Information Tables*, at http://www.mwcc.state.ms.us/info/_annreportcumu.asp ("Total Claims by Year") (last visited Sept. 1, 2009).

Employers receive fixed levels of potential liability which they can anticipate and treat as a general "cost of doing business."

¶6.     Mississippi Code Section 71-3-9 provides, in part, that "[t]he liability of an employer to *pay compensation* shall be *exclusive* and in place of all other liability of such employer to the employee . . . ."  Miss. Code Ann. § 71-3-9 (Rev. 2000) (emphasis added).  However, based upon the statutory requirement that the "injury" be "accidental" to be compensable under the Act, *see* Mississippi Code Sections 71-3-3(b), 71-3-7, this Court has found that some intentional torts are outside the scope of the exclusivity provision in Mississippi Code Section 71-3-9.  Miss. Code Ann. §§ 71-3-3(b), 71-3-7 (Rev. 2000).  *See **Royal Oil Co. v. Wells***, 500 So. 2d 439, 442 (Miss. 1986) ("the [Act] does not bar an employee from pursuing a common law remedy against his employer for an injury caused by his employer's wilful and malicious act"); ***Miller***, 444 So. 2d at 371 ("where an *injury* is *caused by* the *willful act of an employee acting in the course and scope of his employment and in the furtherance of his employer's business*, the [Act] is *not* the *exclusive remedy* available to the injured party") (emphasis added).  This limitation on the Act's exclusivity "reflects the public policy that certain courses of conduct (intentional torts) are so shockingly outrageous and beyond the bounds of civilized conduct that the person responsible should not be rewarded with tort immunity."  Bradley & Thompson, *Mississippi Workers' Compensation* at § 11:8.

¶7.     In ***Peaster v. David New Drilling Co.***, 642 So. 2d 344 (Miss. 1994), this Court held that "[a] mere willful and malicious act remains insufficient to give rise to the exception under the Act."  *Id*. at 348.  *See also **Blailock v. O'Bannon***, 795 So. 2d 533, 535 (Miss. 2001) ("[r]eckless or grossly negligent conduct is not enough to remove a claim from the

6

exclusivity of the Act."). The employee also must establish that the egregious act was accompanied by an "actual intent to injure" in order to except the Act's grant of exclusivity. *See id.*; *Peaster*, 642 So. 2d at 348-50; *Griffin v. Futorian Corp.*, 533 So. 2d 461, 464 (Miss. 1988). Thus, Mississippi is in concurrence with an overwhelming majority of states in requiring an "actual intent to injure" the employee. *See* 6 Arthur Larson, *Larson's Workers' Compensation Law* § 103.01 nn.4-6, § 103.04[1] (2008).

¶8.     Having set forth the law in existence at the time the subject events unfolded, we turn to the specific facts developed and stipulated in this case.

## FACTS

¶9.     Franklin Corporation is a furniture manufacturer located in Houston, Mississippi. In January 1999, George Parker, an employee of Mid-South Adhesives, Inc. ("Mid-South"), made a presentation to Franklin Corporation regarding Mid-South's Soft Seam Adhesive ("Soft Seam") product. During the presentation, Parker provided Franklin Corporation with a May 22, 1998, "Material Safety Data Sheet" ("MSDS")[4] and warning label for Soft Seam. The MSDS disclosed that Soft Seam contained a neurotoxin known as propyl bromide ("1-BP") and included a "[m]anufacturer's recommended exposure limit" of no more than 100 parts per million ("ppm"). Under "Section VI - Health Hazard Data," the MSDS further declared that the product was an "[i]rritant to upper respiratory tract. Symptoms may include coughing, headache, nausea, dizziness, wheezing, laryngitis, shortness of breath and

---

[4]According to John T. Gordon, a "Technical Director Chemist" responsible for creating the MSDS for Mid-South, "[t]he purpose of an MSDS sheet is to inform workers of hazardous chemicals in the workplace."

vomiting. These short term acute [e]ffects of exposure are noticed above 150 to 250 ppm."

Regarding symptoms of exposure to the skin, the MSDS revealed a risk of "[i]rritation,

defatting of skin, and dermatitis." Furthermore, "[p]rolonged exposure to [1-BP] can cause

adverse effects to the liver, kidney, central nervous system and respiratory system." "Section

VII - Precautions for Safe Handling and Use" included, "Warning! Vapors harmful! Use

only with adequate ventilation!" "Section VIII - Control Measures" provided:

> [a]bove PEL/TLV ["permissible exposure limit/threshold limit value"], an
> approved organic vapor type respirator is acceptable. Approved self-contained
> breathing apparatus or air line respirator with full face piece, is required for
> vapor concentrations above 1000 ppm and for spills and emergencies.
>
> . . . .
>
> Do not use in confined space. Open doors and/or windows. Use ventilation
> to maintain employee exposure levels below the manufacturers recommended
> exposure limit.
>
> . . . .
>
> Avoid contact with skin and avoid breathing vapors.

By June 30, 1999, and later, on July 31, 2002, the PEL/TLV in the MSDS for Soft Seam was

reduced to "100 ppm." As stipulated by the parties, Franklin Corporation:

> was aware of the contents of the MSDS and warning label and the language
> relating to ventilation,[5] respiratory, skin and eye protection requirements for
> use of [Soft Seam] as well as the potential harmful effects to humans for
> prolonged, unprotected exposure to [1-BP] at levels that exceeded the
> applicable exposure levels.

---

[5]Parker discussed ventilation with Don Livingston, vice-president and director of
purchasing at Franklin Corporation, who replied "it was going to be awfully expensive."
Livingston denied this statement and testified that "Parker never told me that it needed
ventilation."

¶10.    The parties stipulated that Franklin Corporation had purchased and used Soft Seam "on its glue line in the production and manufacture of furniture[,]" beginning in 1999. According to Livingston, Soft Seam provided a significant cost savings to Franklin Corporation, as the glue line was reduced from three shifts to one shift. However, Franklin Corporation decided not to install mechanical ventilation exhausts outside the building on the glue line.[6][7]

¶11.    In September 2000, Franklin Corporation moved its poly department, including the glue line, into a new, 90,000-square-foot building. Although the facility had air conditioning, no mechanical ventilation was installed exhausting outside the building.[8] On February 7, 2001, Franklin Corporation temporarily ceased purchasing Soft Seam due to a change in its production methods. On April 10, 2001, an "Industrial Hygiene Evaluation" was performed by industrial hygienist Kevin C. Housman on behalf of Franklin Corporation's workers' compensation insurer, Liberty Mutual Insurance Company, addressing "noise reduction and hearing protection, wood dust exposure, and exposure to organic vapors including but not

---

[6]The building did have a downdraft system which exhausted air outside the booths in which glue-line employees worked, along with roof fans.

[7]Linda Bean, a glue-line employee in 1999, testified that another glue-line employee had directly confronted Hassell Franklin, the president, CEO, and principal shareholder of Franklin Corporation, in the old building about the need for ventilation. She further testified that Franklin had responded that he was not going to spend any more money as they would be moving into the new building soon.

[8]According to Frank Casteel, an electrician in the maintenance department at Franklin Corporation, John Lyles, the vice-president of manufacturing at Franklin Corporation at all relevant times, instructed him not to run electricity to the downdraft system in the new building.

limited to [1-BP] on the glue line." The May 8, 2001, report issued by Housman notably found that:

> [m]ost exposures were either below our lab's quantifiable limits and/or below the corresponding TLVs, except for Ms. [Linda] Bean's exposure to [1-BP]. Her 8-hr TWA ["time-weighted average"] exposure was calculated to be 75 ppm.[9] *This particular chemical has a manufacturer's recommended workplace exposure limit of 10 to 25 ppm. Thus, substitution of this gluing agent currently in use at the Polyfoam Plant is strongly encouraged. Ventilation of this process should be considered a secondary control and is also recommended.*[10]

(Emphasis added.) Scott Shempert, the safety director at Franklin Corporation at all relevant times, wrote a note on his copy of Housman's report providing "contacted [Livingston] 5-16-01[,] said he would look into it." No glue-line employees at Franklin Corporation were notified of the results reported or the recommendations provided in Housman's report concerning 1-BP. None of the ventilation or respiratory-protection recommendations in Housman's report were implemented by Franklin Corporation.[11] On January 30, 2002, Franklin Corporation resumed purchasing Soft Seam from Mid-South. On July 31, 2002, the

---

[9]Specifically, Housman measured 28 ppm over 161 minutes and 110 ppm over 216 minutes.

[10]Other pertinent recommendations by Housman included the implementation of a respiratory protection program, the installation of a chemical review process regarding MSDSs, future air monitoring, and informing glue-line employees of the present exposure levels.

[11]Shempert maintained that prior to July 31, 2002, the MSDS for Soft Seam provided that the "[m]anufacturer's recommended exposure limit" was 100 ppm, which was greater than the 75 ppm time-weighted average in Housman's report. On that basis, and despite Housman's reference to 10-25 ppm as the "manufacturer's recommended workplace exposure limit," Franklin Corporation consciously chose not to inform glue-line employees of the exposure risks associated with 1-BP or to implement the recommendations related to 1-BP included in Housman's report.

MSDS for Soft Seam was revised to include an "EPA proposed acceptable exposure limit" of 25 ppm regarding 1-BP.[12]

¶12.    Regarding the Plaintiffs, their employment on the glue line began as follows: Tedford -- April 12, 1999; Haire -- September 16, 2002; Mixon -- September 15, 2003; and Smith -- October 22, 2003.  Their wages varied between eight and nine dollars per hour.  On the glue line, the Plaintiffs would use "a pressurized spray system to apply [Soft Seam] to foam used in the manufacture of furniture produced and sold by Franklin Corporation."[13]  In September 2003, new wooden spray booths for the glue-line employees were constructed.  The new booths were draped in plastic and were primarily occupied by Plaintiffs Smith, Mixon, and Haire.[14]  According to glue-line employee Vicki Veazey:

> when you was in those booths, . . . the scent was too strong because it could not escape.  Naturally, if you had had ventilation or even the top was open, it would have been better . . . , but at the time the . . . booths had the little plastic tops across the top of them.[[15]]

---

[12]However, according to Gordon, the "EPA does not regulate the workplace." Shempert added that "the fact that it was a proposed acceptable exposure limit did not put it in place, in my opinion as the safety director [at Franklin Corporation]."  On the other hand, the expert testimony of occupational toxicologist Gaku Ichihara, M.D., was that the EPA regulates 1-BP "because . . . [1-BP] is the alternative to the freon or other ozone-depleting solvents."

[13]The parties stipulated that the Plaintiffs' entire exposure to 1-BP occurred at Franklin Corporation, while in the course and scope of their employment.

[14]The booth in which Tedford worked was slightly larger and did not have a plastic cover over the top.

[15]By Haire's description, "most of the vapors would come right back into you.  It didn't have nowhere to go."

11

Shempert did not consider the installation of these new booths to be a manufacturing change, and thus did not request updated air testing on the glue line.

¶13. Throughout the Plaintiffs' employment, numerous glue-line employees testified to making repeated complaints to supervisors and upper management about the ill symptoms they were experiencing, the need for ventilation, and the need for protective gear. The adverse symptoms experienced by glue-line employees frequently were exacerbated when operating in the new booths.

¶14. The Plaintiffs testified that their complaints routinely were dismissed or ignored by supervisors and upper management.[16] Tedford testified that when she initially complained to James R. Clark, the superintendent of the poly department from January 1999 until September 2003, "he told me that it wasn't the glue. They had been using it for years." Later, Clark informed Tedford that Franklin Corporation was not "going to ventilate it because of the money." Mixon testified that Jeff Clements, the superintendent of the poly department beginning in September 2003, told her that ventilation "was too expensive. It would probably never happen."[17] When Tedford complained to Jimmy Pumphrey, a superintendent in the poly department, "[h]e just played it off. [He said] [t]here's nothing

_____

[16]For instance, according to Veazey, when she informed her supervisor that the glue was causing her headaches, she was simply told to take some Tylenol.

[17]According to Smith, in response to her request for ventilation, Clements "looked at the ceiling, and he said, there's no way to put ventilation in here. He said that . . . it was too expensive and they couldn't afford it." Haire testified that Clements told her that "he had already asked and they told [him] that there was no money appropriated for it at the time."

12

wrong with you. Go on back in your booth and go to work."[18] Casteel testified that when one employee complained to vice-president Lyles that the glue was "burning our hands and making us dizzy, . . . he just smiled and walked off."

¶15. According to Clark:[19]

> I had complained to [Livingston] about the fumes and problems being reported by the workers in the glue line.[20] He stated at that time that he knew that Franklin [Corporation] needed to install a ventilation system on the glue line, but that he didn't believe that Hassell Franklin had decided to "let me put a hole in the ceiling" to install such a ventilation system.[21]

When Clark informed Lyles of further complaints by glue-line employees, Lyles "told [him] that [he] was not doing a good enough job of convincing the Plaintiffs that their complaints were 'all in their heads' and that I had to be a 'better salesman' to convince the Plaintiffs that

---

[18]Mixon and glue-line employees Jackie Davidson and Lynn Byars testified to similar responses from Pumphrey. According to Smith, Pumphrey would occasionally "laugh at us, saying y'all are high. I believe that glue has gone to y'all's head or something." Casteel heard Pumphrey tell one employee, "[e]ither do the job or go home." Smith further testified that Pumphrey's response to her request for ventilation was "[t]hat there will never be, and [he] walk[ed] away."

[19]This Court notes that Clark did not testify at trial. His testimony, derived from his November 2, 2004, affidavit and November 2, 2005, deposition, was, however, considered by the circuit court in ruling on Franklin Corporation's "Motion for Summary Judgment." This Court considers Clark's testimony only for purposes of assessing that ruling. *See* ¶ 33 *infra*.

[20]Livingston denied having knowledge of any employee complaints prior to January or February 2004.

[21]Jim Tidwell, a supervisor at Franklin Corporation in 1999 and 2000, testified that he personally had observed Franklin discuss ventilation and then refuse its installation.

their complaints were not real."[22] Clark additionally provided that in a meeting with Franklin and Lyles, Franklin informed him:

> that he "was not going to throw money at this problem." He said that no ventilation system would be installed as the company was not going to spend money on a glue line ventilation system for an adhesive that was probably not going to be allowed much longer anyway, and that it would be a waste of money . . . regardless of any complaints from the workers on the glue line.[23]

Moreover, Clark testified that Franklin and Lyles had maintained that "we're not going to suck the air-conditioning out through holes in the ceiling." According to Clark, Franklin had referred to glue-line employees as performing a "grade two job"[24] and that "if they don't like it . . . they can go to work somewhere else." Furthermore, Clark testified that Lyles had stated "there are people lined up out there for jobs; if they start dropping like flies, or something in that order, we can replace them today . . . ."

¶16. The Plaintiffs further assert that they were not provided with adequate protective gear. Smith testified that she asked Pumphrey for respiratory masks "[a]t least once a week[,]" but that "[t]hey just always said they would get it, and it never came."[25] Following a spill of

---

[22]By contrast, Lyles asserted that he did not become aware of complaints by glue-line employees until mid-February 2004.

[23]Franklin denied stating that he would not install ventilation because it was too expensive, and testified that he was unaware of any ventilation complaints prior to 2004. According to Franklin, when he learned of the problem, "we installed the ventilation system."

[24]Clark stated that a "grade two job" means "the lowest level in the house, anybody can do it."

[25]According to Shempert, however, white paper dust masks manufactured by 3M were always available to glue-line employees. On this subject, Clements testified that glue-line employee Norma Pettit was the only employee from whom he had heard complaints. Thereafter, Clements stated that he gave her a face mask.

14

approximately 330 gallons of Soft Seam in September 2000, Clark testified that he and Pumphrey were "instructed by . . . Lyles to clean up the spill with no ventilation, protective clothing or protective respiratory equipment." When Clark experienced dizziness and nausea, he claims that Lyles "told me to go outside and take a break, but do whatever it took to get it cleaned up."

¶17. Following complaints of Tedford, after her review of the MSDS, Clark stated that Lyles directed Pumphrey "to keep all information away from employees . . . . In accordance with these instructions, all MSDS[s] were thereafter removed from the [Soft Seam] containers by [Pumphrey] . . . ."[26] Relatedly, numerous employees testified that the MSDSs were removed from the glue drums.[27] In one instance, when Smith asked Pumphrey where the MSDS was, "he said, there's not one."

¶18. On January 27, 2004, Smith was placed on medical leave by Franklin Corporation, and subsequently was admitted to the hospital on January 29, 2004. Smith reported symptoms to her treating physician, Dr. Kevin Merigian, of "numbness and tingling from waist to toes, nervous -- shakin[g], headache, dizziness, nausea, vomiting -- cramping in toes, feet and . . . calf." On February 9, 2004, Haire was placed on medical leave by Franklin Corporation, and then was admitted to the hospital on February 12, 2004. Haire stated symptoms to Dr. Merigian of "stinging in feet and numbness from waist to my feet." On February 14, 2004, Mixon was admitted to the hospital after being placed on medical leave

[26]An updated MSDS sheet was attached to the glue drum of every shipment of Soft Seam.

[27]Conversely, Pumphrey testified that when glue-line employees began taking the MSDSs off the glue drums, "I started taking them off and putting them in the office."

15

by Franklin Corporation that same day. Mixon reported symptoms to Dr. Merigian of "numbness in butt, lower back, legs, and feet; feels like they are asleep and tingling; vomiting; headaches; dizziness; trouble breathing."[28] On April 21, 2004, Tedford was placed on medical leave by Franklin Corporation, and thereafter received medical treatment on April 22, 2004. Tedford experienced symptoms of leg numbness, heaviness in her lower extremities, and difficulty walking.[29]

¶19.   On February 16, 2004, Franklin Corporation placed its final order for Soft Seam. That same day, Livingston informed Parker that several glue-line employees (specifically, Smith, Haire, and Mixon) had been hospitalized, and that further air testing was necessary. On February 17, 2004, Parker conducted an air-sampling test on the glue line at Franklin Corporation. This was only the second air test performed on the glue line in the five years since Franklin Corporation had begun using Soft Seam. According to Tedford, glue-line operations were slow that day. Parker's subsequent letter to Shempert and Livingston provided that "[v]enting the exhaust through the roof with mechanical air assisted motors is required to meet *the 25 PPM standard* in the work area." (Emphasis added.) On February 23, 2004, an industrial hygienist from the Occupational Safety and Health Administration (OSHA) arrived unannounced and tested the air quality on the glue line. Glue-line

---

[28]On April 12, 2004, Mixon returned to Franklin Corporation and began working in the backfilling department, where she remained employed at the time of trial.

[29]Nearly three years later, on March 17, 2007, Dr. S.H. Subramony, a board-certified neurologist, examined the Plaintiffs and found permanent residual neurological deficits causing continued motor difficulties in Tedford and "significant disability" in Haire and Smith. At trial, Dr. Merigian opined, to a reasonable degree of medical certainty, that the chances of Smith's condition improving were "quite poor" and that Haire's and Tedford's conditions "will not improve[.]"

16

employees testified that glue-line operations were typical that day. The inspection report from OSHA, issued April 26, 2004, found time-weighted averages of 1-BP of 205 and 219 ppm. According to the report, 219 ppm "is 9 times the [MSDS] recommended level of 25 [ppm] and 43 times the target limit of 5 [ppm] recommended by OSHA Technical Center."[30] The report noted the absence of ventilation, respiratory protection for employees, or sufficient air testing performed by Franklin Corporation.[31]

¶20. On February 27, 2004, Franklin Corporation began purchasing a new glue containing acetone from Mid-South. On March 10, 2004, new ventilation booths were installed on the glue line at Franklin Corporation and were fully operable. Fabrication and installation of the new ventilation booths by Kline Heating and Air cost $11,165. Following installation of ventilation, glue-line employees were instructed on the nature and use of the acetone glue.

¶21. From February 16, 2004, until March 10, 2004, Franklin Corporation continued to use Soft Seam without providing additional ventilation or respiratory protection to glue-line employees, and without informing them of the overexposure reported by Parker. According

---

[30]At the time of trial, OSHA had not yet set exposure limits for 1-BP. However, according to Gordon, the American Conference of Governmental Industrial Hygienists set the threshold value limit for exposure to 1-BP at 10 ppm in June 2004.

[31]On April 27, 2004, OSHA issued a "Citation and Notification of Penalty" to Franklin Corporation. For the "serious" violation of excessive exposure of glue-line employees to 1-BP, OSHA proposed a $3,500 penalty. For the "serious" violation of the absence of employee "training on the hazards on the [S]oft [S]eam adhesive[,]" OSHA proposed a $1,125 penalty. On May 19, 2004, an "Informal Settlement Agreement" was reached between Franklin Corporation and OSHA whereby Franklin Corporation "agree[d] to correct the violations" and OSHA amended the penalties to $2,000 and $500, respectively.

to Shempert, "[m]y position as the corporate representative[32] would be that we would follow the OSHA regulations provided to us by these MSDS, and we did so." Shempert maintained that the absence of recommended exposure limits by OSHA weighed heavily in the decision not to ventilate. Shempert testified that:

> OSHA is the governing body over which workers should be able to come in and have a safe workplace . . . . They don't have an exposure limit. The manufacturer sets 100 [ppm], so that's what I was going on as a secondary measure, but OSHA would take precedence over anything else in any of these.

By contrast, industrial hygienist John Spencer testified:

> I can't think of [a plant] that was worse[,] to put . . . a group of individuals, into an enclosed area and spray a solvent day in and day out for hours upon hours . . . without any ventilation, without proper respiratory protection is not only [a] violation of a variety of occupational health standards; but it's just, it's difficult for me to explain why someone would do that, especially in light of the complaints that were coming from those individuals conducting that work.

Spencer opined, "if they had followed [Housman's] recommendations and followed [Parker's] recommendations, they would have likely significantly reduced those exposures where it wouldn't have been a harmful level."

¶22.    On August 16, 2004, a Complaint was filed in the Circuit Court of Calhoun County by the Plaintiffs, along with Clark, Sandra Darlene Clark,[33] Tommy Tedford, Harold E. Haire, and Joshua Mixon[34] against Franklin, Lyles, Livingston, Clements, Pumphrey, and

---

[32]According to Livingston, however, the ultimate decision on ventilation would have been made by Franklin.

[33]On May 7, 2007, an "Order of Voluntary Dismissal" was entered by the circuit court as to "all of the claims plead[ed] by Plaintiffs, James R. Clark and Sandra Darlene Clark . . . against all of the Defendants . . . ."

[34]Tommy Tedford, Harold E. Haire, Joshua Mixon, and Sandra Darlene Clark claimed losses of consortium.

18

John Does 1-10 ("Franklin Defendants"),[35] Franklin Corporation, and Mid-South.[36] The causes of action asserted in the Complaint included: breach of warranty, negligence, and negligence per se by Mid-South; misrepresentation, intentional misrepresentation, fraud,[37] and civil conspiracy[38] by Mid-South, Franklin Corporation, and the Franklin Defendants; battery by Franklin Corporation and the Franklin Defendants; and intentional infliction of emotional distress by Mid-South, Franklin Corporation, and the Franklin Defendants. The

---

[35]On May 7, 2007, the Plaintiffs agreed to dismiss with prejudice the claims asserted against the individual Franklin Defendants. Per that agreement, "the individual defendants will execute affidavits, the form and content of which have been agreed to by counsel for the individual defendants and counsel for the plaintiffs." The affidavit of each "Franklin Defendant" provided:

> [a]t all relevant times plead [sic] in the Complaint for this civil action, and at all relevant times of my employment with Franklin Corporation to which I testified in my deposition, all of my acts and omissions, *including my intentional acts and omissions, if any*, were in the course and scope of my employment with Franklin Corporation as a management level employee, as a means to accomplish the purposes of my employment, and in furtherance of the business of Franklin Corporation. All of my actions and omissions, *including my intentional acts and omissions, if any*, were authorized and/or ratified by Franklin Corporation.

(Emphasis added.)

[36]The Second Amended Complaint, filed in the circuit court on January 26, 2007, added Locke Barkley, Bankruptcy Trustee for Pauline and Tommy Tedford, and Selene Maddox, Bankruptcy Trustee for James and Sandra Darlene Clark, as Plaintiffs. Based upon the May 7, 2007, "Order of Voluntary Dismissal," all claims of the Clarks, by and through Maddox, also were dismissed.

[37]On May 25, 2007, the circuit court entered an "Agreed Order and Rule 54(b) Judgment of Dismissal with Prejudice as to Plaintiffs' Intentional/Fraudulent Misrepresentation Claims" against Franklin Corporation and Mid-South.

[38]On May 22, 2007, the circuit court entered an "Agreed Order and Rule 54(b) Judgment of Dismissal with Prejudice as to Plaintiffs' Civil Conspiracy Claims" against Franklin Corporation and Mid-South.

19

Complaint added that "the actions of Defendants are so egregious, willful, wanton and malicious in nature that punitive damages are requested . . . ."

¶23. On October 21, 2004, Franklin Corporation filed a "Motion to Dismiss," relying on the "exclusive remedy" provision of the Act, Mississippi Code Annotated Section 71-3-9 (Rev. 2000). At the hearing thereon, Circuit Judge Andrew K. Howorth conceded that "[t]his is a tough one." Ultimately, however, the motion was denied as "the [c]ourt specifically finds that the Plaintiffs have alleged sufficient facts and causes of action, which under the relevant standard of review, satisfy the intentional tort exception to the application of [the Act]." Franklin Corporation subsequently filed a "Petition for Interlocutory Appeal and to Stay Enforcement of Circuit Court Order Pending Appeal" regarding the exclusivity of the Act, which the circuit court granted. This Court initially granted Franklin Corporation's "Petition for Interlocutory Appeal," but thereafter dismissed it as improvidently granted.

¶24. On May 19, 2006, Franklin Corporation filed a "Motion for Summary Judgment" in the circuit court, reiterating that the Plaintiffs' "exclusive remedies are pursuant to the [Act] . . . ." At that hearing, the circuit judge stated:

> while I'm not aware of any law on this, I think intent can be like scienter is in the law. . . . We know that in scienter you knew or should have known; and *I think with intent you either intended it or you were possessed with sufficient facts where you could be deemed to have intended it even if you didn't intend the specific consequences* . . . . That's just kind of my view of the thorniness of this thing.

(Emphasis added.) On that basis, while deeming the matter to be "very close," the circuit judge denied the motion, finding there "are genuine issues of fact as to whether or not there was *intent to injure*." (Emphasis added.)

20

¶25.   Following a three-week trial, the jury found in favor of the Plaintiffs on the claims of *battery and intentional infliction of emotional distress* against Franklin Corporation.  The "Final Judgment" recited that "[t]he jury found in favor of [Mid-South] on the claim of negligence asserted against it by Plaintiffs."[39]   All liability was attributed to Franklin Corporation, and compensatory damages were assessed, as follows: Mixon -- $75,000; Tedford -- $800,000; Smith -- $250,000; Haire -- $800,000.[40]

¶26.   The issue of punitive damages was then presented to the jury, which returned a verdict of $7,500,000 for the Plaintiffs against Franklin Corporation.  The "Final Judgment" of the circuit court, "upon due consideration of the net worth and financial condition" of Franklin Corporation *at the time the complaint was filed*, concluded that the proper amount of punitive damages to be awarded was $1,836,213, pursuant to Mississippi Code Annotated Section 11-1-65(3)(a) (Rev. 2002).

¶27.   Franklin Corporation subsequently filed a "Motion for J.N.O.V., or in the Alternative, for a New Trial or a Remittitur," and the Plaintiffs filed a "Motion to Reconsider Punitive Damages, to Alter or Amend Final Judgment, for Relief from Final Judgment, or for Other Relief."  The Plaintiffs sought amendment of the "Final Judgment":

> by either: a) adjusting and amending that . . . punitive damages figure from $1,836,213 to $5,000,000 to comport and comply with Miss. Code Ann. Section 11-1-65 (Supp. 2003) by application of the statutory cap to the "net worth" figure of $61,543,082 for . . . Franklin Corporation, which was its *"net worth" at the time of trial*; or b) amending and adjusting the punitive damages

---

[39]Thereafter, a "Final Judgment" was entered by the circuit court dismissing the Plaintiffs' claims against Mid-South with prejudice.

[40]The jury awarded no damages to Plaintiffs Tommy Tedford, Harold E. Haire, and Joshua Mixon on their loss-of-consortium claims.

. . . from $1,836,213 to the $7,500,000 punitive damages amount awarded by the verdict of the jury without statutory reduction if Miss. Code Ann. Section 11-1-65(3)(a-c) (Supp. 2003) is found to be void, unconstitutional and/or inapplicable.

(Emphasis added.) Thereafter, the circuit court entered an "Order Granting Motion to Reconsider Punitive Damages, to Alter or Amend Final Judgment, for Relief from Final Judgment, or for Other Relief," finding that:

the proper net worth of [Franklin Corporation] to be utilized in the application of the legislative caps is the *current net worth* . . . which is $61,543,082. This figure was the net worth of [Franklin Corporation] for the 2006 fiscal year, and was substantially the same at the time the jury rendered its verdict and at the time the court conducted its hearing on the Defendant's motion to reduce the punitive damages award . . . .

(Emphasis added.) Pursuant to Mississippi Code Section 11-1-65(3)(a-b), the circuit court ordered that "the punitive damages awarded by the jury . . . are to be reduced to $5,000,000 and that the Final Judgment dated May 31, 2007, be amended to reflect this adjustment." That same day, the circuit court entered an "Order Denying Franklin [Corporation's] Motion for J.N.O.V., or in the Alternative, for New Trial or Remittitur." On July 30, 2007, the "Amended Final Judgment" was entered in favor of the Plaintiffs and against Franklin Corporation in the total amount of $7,475,593.59, with post-judgment interest of 8.25 percent. From that ruling, Franklin Corporation filed a "Notice of Appeal," from which the circuit court entered an "Agreed Order for Stay Pending Appeal" as to enforcement of the "Amended Final Judgment."

**ISSUES**

¶28.   This Court will consider:

(1) Whether the Act precludes the Plaintiffs' claims.
(2) Whether the circuit court abused its discretion in admitting the expert testimony of Dr. Kevin Merigian, Dr. Jennifer Majersik, Dr. S.H. Subramony, and Dr. Gaku Ichihara.
(3) Whether the circuit court's granting of certain jury instructions constituted reversible error.
(4) Whether the circuit court abused its discretion in permitting the jury to consider punitive damages.
(5) Whether the punitive damages assessed in the circuit court's "Amended Final Judgment" were erroneous as a matter of law.

**ANALYSIS**

**I.      Whether the Act precludes the Plaintiffs' claims.**

¶29.   The applicability of the Act, Mississippi Code Section 71-3-1 through 71-3-225, is a question of law. This Court reviews questions of law de novo. *See **Miss. Ethics Comm'n v. Grisham***, 957 So. 2d 997, 1000 (Miss. 2007) (quoting ***32 Pit Bulldogs v. County of Prentiss***, 808 So. 2d 971, 973 (Miss. 2002)).

¶30.   Paragraphs three through six *supra* set out the historical background of the Act, along with our pertinent decisions addressing intentional-tort exceptions to the Act. In ***Miller***, this Court found that certain intentional torts are outside the scope of the exclusivity provision contained in Mississippi Code Section 71-3-9. *See **Miller***, 444 So. 2d at 371 ("where an *injury* is *caused by* the *willful act of an employee acting in the course and scope of his employment and in the furtherance of his employer's business*, the [Act] is *not* the *exclusive remedy* available to the injured party") (emphasis added). *See also **Royal Oil***, 500 So. 2d at 442 ("the [Act] does not bar an employee from pursuing a common law remedy against his

23

employer for an injury caused by his employer's wilful and malicious act"). Mississippi law clearly provides that certain intentional torts lie beyond the scope of the Act's exclusivity.

¶31.   However, in *Peaster*, we held that "[a] mere willful and malicious act remains insufficient to give rise to the exception under the Act." *Peaster*, 642 So. 2d at 348. *See also Blailock*, 795 So. 2d at 535 ("[r]eckless or grossly negligent conduct is not enough to remove a claim from the exclusivity of the Act."). Before recovery may be had for the specific injuries and/or diseases which the Plaintiffs claim, there must be proof of actual intent to injure by Franklin Corporation. In *Griffin*, this Court stated:

> Dunn, *Mississippi Workmen's Compensation*, (3d ed. 1982 & Supp. 1984), notes that in order for a willful tort to be outside the exclusivity of the Act, the employee's action must be done "*with an actual intent to injure the employee. It is not enough to destroy the immunity that the employer's conduct leading to the injury consists of aggravated negligence or even that the conduct goes beyond this to include such elements as knowingly permitting hazardous conditions to exist or willfully failing to furnish a safe place to work or knowingly ordering the employee to perform a dangerous job. [Footnote omitted].*" *Id*. at § 22.

*Griffin*, 533 So. 2d at 464 (emphasis added). After referencing the above-quoted portion of *Griffin*, this Court addressed the requisite level of "intent" in *Peaster*. *See Peaster*, 642 So. 2d at 347-49. Issue II therein succinctly placed before the Court the question of whether "this Court should recognize an exception to the exclusive liability provision where the employer has knowingly permitted hazardous conditions to exist which are substantially certain to result in injury or death." *Id*. at 348. According to this Court:

> [t]he appellants urge this Court to "*consider enlarging* the scope of the intentional tort exception *to include* those acts which consist of the employer willfully permitting hazardous conditions to exist which are *substantially certain, although perhaps not specifically intended, to result in the injury or death of an employee*."

24

. . . .

> There is nothing novel about the approach suggested by the appellants of enlarging the scope of the exemption test. We have stated consistently our position on this issue. The legislature has had every opportunity to include into the Act such a liberal exception suggested by the appellants, yet failed to do so. If this Court were to include what the legislature did not, we would violate the "purpose, spirit and philosophy of the [Act]." **Brown v. Estess**, 374 So. 2d 241, 242 (Miss. 1979).

**Peaster**, 642 So. 2d at 348-49 (emphasis added). In conclusion, the **Peaster** Court held:

> [t]he employer's conduct may have been reckless, negligent, or grossly negligent, but that [is] not enough to remove this case as an "intentional tort" from the exclusivity of the [Act]. This Court has held repeatedly that the employer's action must be done "with an actual intent to injure the employee," and that "an intentional tort is an act of intentional behavior designed to bring about the injury." We do not today choose to expand this Court's interpretation of what constitutes an intentional tort exception.[41]

*Id*. at 349-50. This view repeatedly has been acknowledged by federal and state courts in Mississippi. *See* **Bailey v. Lockheed Martin Corp.**, 432 F. Supp. 2d 665, 671 (S.D. Miss. 2005) (citing **Peaster** for the proposition that "[t]o be deemed intentional, [the employer's] acts or inaction must be designed to bring about the injury."); **Thornton v. W.E. Blain & Sons, Inc.**, 878 So. 2d 1082, 1086 (Miss. Ct. App. 2004) (citing **Peaster** for the proposition that this Court "already has declined to create a 'substantial certainty' exception to the

---

[41]This is in accord with the standard applied by the majority of states. Of the forty states which recognize an intentional-tort exception to their workers' compensation statutes, only twelve have adopted a broader definition than "actual intent to injure. *See* 6 Larson, *Larson's Workers' Compensation Law* § 103.01 nn.4-6; § 103.04[1]. "Under the most popular formulation, adopted by eight states, an employer is suable in tort if it knows that its conduct causing the injury is 'substantially certain' to cause injury or death." *Id*. at § 103.04[1]. *See also* **Bazley v. Tortorich**, 397 So. 2d 475, 480 (La. 1981) (example of application of the "substantially certain" standard).

exclusivity provision of the Act . . .”). We conclude, once again, that the Act is exclusive absent an actual intent to injure the employee.

¶32. No party contests that the Plaintiffs' injuries “arose out of and in the course of employment . . . .” Miss. Code Ann. § 71-3-3(b) (Rev. 2000). The circuit court was presented with the issue of whether the Act precluded the Plaintiffs' claims at three distinct stages of this proceeding: Franklin Corporation's “Motion to Dismiss,” Franklin Corporation's “Motion for Summary Judgment,” and Franklin Corporation's “Motion for J.N.O.V.” At each stage, the circuit court rejected Franklin Corporation's contentions otherwise and denied the respective motions. Regarding the “Motion to Dismiss,” the circuit court found “that the Plaintiffs have alleged sufficient facts and causes of action, which under the relevant standard of review, satisfy the intentional tort exception to the application of [the Act].” Taking the allegations set forth by the Plaintiffs as true, *see Penn National Gaming, Inc. v. Ratliff*, 954 So. 2d 427, 430 (Miss. 2007), this Court finds no error in that ruling.

¶33. As to the “Motion for Summary Judgment,” based upon the collective “pleadings, depositions, answers to interrogatories and admissions on file, together with . . . affidavits,”[42] Mississippi Rule of Civil Procedure 56(c), the circuit court concluded that there were “genuine issues of fact as to whether there was intent to injure[,]” with respect to the Plaintiffs' claims of battery and intentional infliction of emotional distress against Franklin Corporation. This Court finds no error in that ruling.

---

[42]Including Clark's testimony from his November 2, 2004, affidavit and November 2, 2005, deposition. *See* footnote 19 *supra*.

26

¶34. Finally, regarding the "Motion for J.N.O.V.," the circuit court found "that during the course of the three week trial . . . there was substantial, credible evidence presented . . . to support the Plaintiffs' causes of action for battery and intentional infliction of emotional distress . . . ." Accordingly, the circuit court concluded that:

> [i]n considering the evidence in the light most favorable to the non-movant, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence, and finding that the evidence was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different verdicts, the court finds that Defendant Franklin [Corporation's] Motion for J.N.O.V. should be denied.

Given the considerable testimony offered by employees and management personnel of Franklin Corporation, viewed "in the light most favorable to [the Plaintiffs], giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence[,]" *Spotlite Skating Rink, Inc. v. Barnes*, 988 So. 2d 364, 368 (Miss. 2008) (citation omitted), this Court affirms the denial of J.N.O.V. given the "substantial evidence[43] to support the verdict." *Adcock*, 981 So. 2d at 948.

**II.     Whether the circuit court abused its discretion in admitting the expert testimony of Dr. Kevin Merigian, Dr. Jennifer Majersik, Dr. S.H. Subramony, and Dr. Gaku Ichihara.**

¶35. This Court has stated that:

> [u]nder Mississippi Rule of Evidence 702, trial courts are charged with being gatekeepers in evaluating the admissibility of expert testimony. [*Irby v. Travis*, 935 So. 2d 884, 912 (Miss. 2006)]. "We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of

---

[43]"Substantial evidence" has been defined as "information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948-49 (Miss. 2008) (citation omitted).

admissibility of expert testimony." ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 40 (Miss. 2003).

***Watts v. Radiator Specialty Co.***, 990 So. 2d 143, 146 (Miss. 2008). Accordingly, "[t]he trial judge has the sound discretion to admit or refuse expert testimony; an *abuse of discretion standard* means the judge's decision will stand unless the discretion he used is found to be arbitrary and clearly erroneous." ***Troupe v. McAuley***, 955 So. 2d 848, 856 (Miss. 2007) (quoting ***Poole v. Avara***, 908 So. 2d 716, 721 (Miss. 2005)) (emphasis added). *See also* ***Bonner v. ISP Tech., Inc.***, 259 So. 2d 924, 932 (8th Cir. 2001) ("[w]e perform only the comparatively narrow analysis of whether the district court's determination that the opinion was sufficiently grounded in 'good science' to assist the jury constituted an abuse of that court's discretion.").

¶36. Mississippi Rule of Evidence 702 states:

> [i]f scientific,[44] technical, or other specialized knowledge[45] will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[44]"'[S]cientific' implies a grounding in the methods and procedures of science." ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469, 481 (1993).

[45]"Knowledge" applies to "'any body of known facts or to any body of ideas inferred from such facts or accepted as truth on good grounds.' Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty." ***Daubert***, 509 U.S. at 590. Furthermore, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." ***Id***.

Miss. R. Evid. 702. In short, the trial judge must "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." **Daubert**, 509 U.S. at 597. *See also* **Watts**, 990 So. 2d at 146 ("[t]his rule makes it necessary for a trial court to apply a two-pronged inquiry when evaluating the admissibility of expert testimony: (1) is the witness qualified, and (2) is the testimony relevant and reliable?"). In **Daubert**, the United States Supreme Court:

> set out four non-exclusive factors to aid in the determination of whether the methodology is reliable. They are:
>
> > (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

**Curtis v. M&S Petroleum, Inc.**, 174 F. 3d 661, 668-69 (5th Cir. 1999) (quoting **Daubert**, 509 U.S. at 593-94). This approach is "a flexible one. Its overarching subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." **Daubert**, 509 U.S. at 594-95.

¶37. Dr. S.H. Subramony, Dr. Kevin Merigian, Dr. Gaku Ichihara, and Dr. Jennifer Majersik were among the Plaintiffs' designated experts. The deposition testimony of Dr. Subramony, a board-certified neurologist, was that after reviewing the Plaintiffs' medical

records, along with pertinent literature on 1-BP,[46] "my interpretation of these four patients is that they had varying degrees of this same problem[,]" namely, residual neurological deficits from exposure to 1-BP. In offering this opinion, Dr. Subramony conceded that he was unaware of the exact concentration of 1-BP to which the Plaintiffs had been exposed. Nonetheless, Dr. Subramony averred that his conclusions and opinions "are supported by the overwhelming facts and the extensive data available on the effects of 1-BP on animals as well as humans, and were reached by using sound methods that are widely accepted in the medical and scientific community."

¶38. The deposition testimony of Dr. Merigian, the treating physician for the Plaintiffs, was that their injuries were caused by exposure to 1-BP.[47] In rendering this opinion, Dr. Merigian admitted that he was unaware of the exact concentration of 1-BP to which the Plaintiffs were exposed or the precise exposure level at which 1-BP becomes harmful to humans. Nonetheless, Dr. Merigian based his conclusion upon his examination of the Plaintiffs, an internet search regarding 1-BP,[48] the "common finding" in tests run by other physicians on

---

[46]This literature included, most notably, the abstract to a case report by Dr. Majersik indicating that "[1-BP] is reportedly [harmful to humans at] about 25 [ppm]." Dr. Majersik's case report, co-authored by E. Martin Caravati, M.D., and John D. Steffens, M.D., was subsequently published as "Severe neurotoxicity associated with exposure to the solvent 1-bromopropane (n–propyl bromide)" in *Clinical Toxicology* 45 at 270-76 (2007).

[47]This comports with the deposition testimony of Franklin Corporation's expert, Dr. George Wilkerson, that exposure to 1-BP was sufficient to, and did, cause the neurologic injuries suffered by Plaintiffs Tedford and Haire.

[48]According to Dr. Merigian, "[t]here was a physician who had written some case reports or a case report about some exposures to [1-BP], and then there was a lot of animal data on rats with [1-BP]." Dr. Merigian later identified this case report as that authored by Dr. Majersik. *See* footnote 46 *supra*.

the Plaintiffs, his review of the Soft Seam MSDS, and the fact that "[t]hey all worked within a spray area that had been modified [in September 2003] and they were using a type of glue that is a known neurotoxin. And as [Franklin Corporation] manipulated the environment to prevent the glue from going onto other individuals within the factory itself, the symptoms and signs arose." As Dr. Merigian stated, "[t]he bottom line is it all fits together." He added that when he spoke with Shempert by phone, "[Shempert] . . . commented that the glue caused these issues but . . . he would not be responsible because he was ignorant to the fact that the glue would cause the problem."

¶39. The deposition testimony of Dr. Ichihara, an occupational toxicologist and a leading expert on 1-BP toxicity,[49] was that "we . . . believe if exposure level is higher than some levels, . . . such overexposure to [1-BP] can cause neurological damage in humans even [if] we don't know the . . . very precise relationship of the dose response." He based this opinion upon case reports which he had both authored and reviewed.[50] While conceding that he had not examined the Plaintiffs and was not aware of the exact concentration of 1-BP to which they were exposed, Dr. Ichihara offered his opinion to a reasonable degree of medical and

---

[49] According to the deposition testimony of Dr. Caravati, "it would be difficult to find anyone anywhere who would be more qualified to render" an expert opinion on the toxicity of 1-BP to humans than Dr. Ichihara. Even Franklin Corporation's expert, Dr. Robert Cox, stated that Dr. Ichihara "is one of the leading researchers that published on [1-BP]."

[50] These include the case report entitled "Encephalomyeloradiculoneuropathy following exposure to an industrial solvent" by Gary Schlar in *Clinical Neurology and Neurosurgery* 101 at 199-202 (1999); Dr. Ichihara's own case report entitled "Neurological Disorders in Three Workers Exposed to 1-Bromopropane" in *Journal of Occupational Health* 44 at 1-7 (2002); and Dr. Majersik's case report. *See* footnote 46 *supra*.

scientific probability that the Plaintiffs' symptoms and health problems were due to exposure to 1-BP.[51]

¶40.    The deposition testimony of Dr. Majersik, a board-certified neurologist, was that few studies have been done on the effect of 1-BP on humans.  Based upon her case report, "[w]e know that my patients had neurologic damage at . . . [108 ppm]. . . .  We don't know how long it takes, . . . how many weeks, months, days, hours of exposure it takes.  All we have are discrete points in time to say somebody had this problem . . . ."[52]

¶41.    Franklin Corporation subsequently filed or joined motions *in limine* to conduct a ***Daubert*** hearing, seeking to exclude the expert opinion testimony of Dr. Subramony, Dr. Merigian,[53] Dr. Ichihara, and Dr. Majersik.  The Plaintiffs responded that "[a]t the core of the

_____

[51]He added that he had never seen a workplace using 1-BP for five years without any ventilation system.  Dr. Caravati found the opinions of Dr. Ichihara to be "based upon sufficient data and facts[,]" the byproduct "of reliable principles and methods that are acceptable and utilized in the community of expert toxicologists[,]" and the result of "correctly appl[ying] the pertinent principles and methods to the relevant facts and data . . . ."

[52]As Dr. Majersik stated, the underlying problem in determining the precise lower level of 1-BP exposure which causes neurologic damage in humans is that a physician cannot ethically "put a bunch of people in a room . . . expose them to glue and see what happens as a case series."

[53]Franklin Corporation's motions with respect to Dr. Subramony and Dr. Merigian specifically stated that their opinions on causation were "offered despite [their] inability to state: (1) what level of exposure to [1-BP] is needed to cause neurologic injuries in humans; and (2) what levels of exposure the Plaintiffs experienced."  The affidavit and testimony of Dr. Robert Cox, a board-certified physician in medical toxicology and emergency medicine, was offered by Franklin Corporation to support this criticism.  In response, the Plaintiffs offered the deposition testimony of Dr. Caravati, whom Dr. Cox acknowledged to be an expert in the field of toxicology, providing "[i]t is my opinion that Dr. Merigian's opinions that he initially formulated as a treating physician with a toxicological background were based upon sufficient data and facts to enable Dr. Merigian to render his opinions."

32

Defendants' motions, the Defendants invite the [c]ourt to ignore the sworn testimony of experts in their respective fields, and they seek to have the [c]ourt journey down the road of 'microanalysis' of each expert's opinions." Following hearing, the circuit court denied Franklin Corporation's ***Daubert*** motions as to each physician. Regarding Dr. Ichihara, the circuit judge stated "that is the one that is not hard for me . . . . [I]t's logical to[ward] that the jury understands that this stuff is dangerous and, . . . so, yes. I think it has a value. I think that this testimony is . . . going to assist the jury, finder of fact." As to Dr. Subramony, Dr. Merigian, and Dr. Majersik:

> the [c]ourt is going to make a *provisional ruling* here today so that the parties can go forward and that will be the [c]ourt will accept them as tendered in their fields of expertise and that they meet the ***Daubert*** criteria for expert testimony assisting the trier of fact. Specifically, including that *they are qualified in their fields*. That *their opinions are helpful to the jury* and *the opinions that they render are relevant* and that *their opinions are based upon reliable methodologies. I think this is a field with limited reliable methodology* . . . . I reserve the right to change my mind but that is the ruling here today and that is the one I would ask that you rely on in proceeding hence forth.

(Emphasis added.)

¶42. At trial, each physician was tendered and accepted in his or her respective field of expertise without objection.[54] Based upon her education and expertise, her review of the Plaintiffs' medical records, her research on the subject of 1-BP toxicity, and her case report,[55]

---

[54]Dr. Subramony was tendered and accepted as an expert in the field of neurology. Dr. Merigian was tendered and accepted as an expert "in the field of general practice and as a treating physician of the [P]laintiffs in this case." Dr. Majersik was tendered and accepted as an expert "in the field of neurology and clinical findings associated with the [1-BP] toxicity and neurological injury."

[55]According to Majersik, based upon the OSHA report, the Plaintiffs experienced "about twice the exposure level" of Majersik's case-report patients. Moreover, the patients in her case report exhibited "very similar" symptoms to the Plaintiffs.

Dr. Majersik opined "that the levels at which these [P]laintiffs were exposed was sufficient to cause the neurologic damage as I read about the damage from the physicians' reports." While admitting that the lower level of harmful exposure to 1-BP has not yet been discovered, she stated that "it seems that the exposure levels and the conditions the patients had is adequate for my expert opinion." Dr. Subramony testified that:

> I concluded that their history of exposure was causative because they all had a very similar story. They all had similar findings on neurological examination, and they all were getting better after the exposure was removed, and none of the laboratory studies and brain scan studies . . . done by other people had revealed any other cause for this.

Although Dr. Subramony conceded that he did not know the Plaintiffs' level of exposure to 1-BP, his opinion, to a reasonable degree of medical probability, was that their exposure level was injury-causing, based upon "temporal association" and research reflecting that exposure to 1-BP can cause neurologic injury. At trial, Dr. Merigian acknowledged that he did not know the lower level of exposure to 1-BP that causes neurologic injury to humans, but he reiterated his opinion, to a reasonable degree of medical probability, that 1-BP caused the Plaintiffs' injuries.[56]

¶43. On appeal, Franklin Corporation argues that "[e]ach of the Plaintiffs' four experts exhibits a fatal flaw. None knew of the [1-BP] exposure level at which injury occurs in humans . . . . None knew of the exposure experienced by the particular Plaintiffs." As such, Franklin Corporation contends that their "testimony does not meet the requirements of admissibility of expert testimony under M.R.E. 702."

---

[56]According to Dr. Merigian, the results of the air testing at Franklin Corporation "helped solidify" his opinions.

¶44. At trial, Franklin Corporation did not object to the tender of Dr. Subramony, Dr. Merigian, Dr. Ichihara, and Dr. Majersik as experts, or to their actual testimony. Therefore, this Court will limit its analysis to the circuit court's denial of Franklin Corporation's *Daubert* motions as to each physician. Only if the circuit judge abused his discretion in so ruling, acting in an "arbitrary and clearly erroneous" manner, will this Court find error. *See Troupe*, 955 So. 2d at 856.

¶45. The neurological impact of 1-BP on humans is a relatively new field of study. As the circuit judge stated, "this is a field with limited reliable methodology . . . ." Furthermore, as Dr. Majersik noted, determining the exact lower level of 1-BP exposure which causes neurologic injury in humans is challenging, given appropriate, ethical constraints. At best, nondefinitive determinations have been rendered via relevant case reports,[57] MSDSs,[58] and organizational recommendations. This Court finds such sources to be sufficient. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty." *Daubert*, 509 U.S. at 590. "[T]he first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." *Bonner*, 259 F. 3d at 928 (quoting *Turner v. Iowa Fire Equip.*

---

[57]"While case-study review is certainly an accepted methodology, trial courts still must be certain that the content of those case studies is *relevant* to the facts at hand." *Watts*, 990 So. 2d at 146 (emphasis added).

[58]As the expert in *Curtis* noted, "the MSDS is a valid and accurate portrayal of the hazards . . . because [MSDSs] are prepared to have all of the information regarding health and environmental hazards, and because the manufacturer is required to research the best, peer-reviewed scientific literature to form these [MSDSs]." *Curtis*, 174 F. 3d at 669.

***Co.***, 229 F. 3d 1202, 1208-09 (8th Cir. 2000)). Similarly, this Court finds that the absence of data on the exact exposure level at which humans suffer neurologic injury ought not preclude the Plaintiffs' experts from testifying, when combined with Franklin Corporation's stipulation that 1-BP is a neurotoxin which can cause neurologic injury to humans and the testimony of its expert, Dr. George Wilkerson, that exposure to 1-BP caused the neurologic injuries suffered by Plaintiffs Tedford and Haire (despite not knowing the exact level at which 1-BP causes injury in humans).

¶46. The collective case reports, MSDSs, and organizational recommendations, paired with the direct and circumstantial evidence in the case *sub judice*, support a causal connection between the Plaintiffs' exposure to 1-BP and their injuries. *See **Curtis***, 174 F. 3d at 670 ("[i]n the present case, both scientific literature and strong circumstantial evidence support the causal connection."). "Under some circumstances, a strong temporal connection is powerful evidence of causation." ***Bonner***, 259 F. 3d at 931. Causal connection is further validated by the results of the air testing performed by Housman, Parker, and OSHA. These tests established that the Plaintiffs were "exposed to a quantity of the toxin that 'exceeded safe levels.'" ***Id***. (quoting ***Bednar v. Bassett Furniture Mfg. Co.***, 147 F. 3d 737, 740 (8th Cir. 1998)). As such, this Court finds that there was sufficient "'evidence from which a reasonable person could conclude' that [the Plaintiffs'] exposure probably caused [their] injuries." ***Id***. at 928. Accordingly, we find no abuse of discretion by the circuit judge in admitting the expert testimony of Dr. Subramony, Dr. Merigian, Dr. Ichihara, and Dr. Majersik, as their qualifications were not legitimately questioned, and their testimony was sufficiently relevant and reliable. *See **Watts***, 990 So. 2d at 146.

III. **Whether the circuit court's granting of certain jury instructions constituted reversible error.**

¶47. On appeal, Franklin Corporation argues that Instructions P-2, P-3, and P-4A, considered as a whole, incorrectly state the law and exist in "substantial conflict" with Instruction D1-2, thereby requiring reversal. Instruction D1-2 states:

> [t]he Court instructs the Jury that in order to recover on their claims against Defendant Franklin Corporation, the Plaintiffs have the burden of proving by a preponderance of the credible evidence that Franklin knowingly exposed the Plaintiffs to unreasonably dangerous levels of the industrial solvent which contained [1-BP] with an actual intent to cause them injury. It is not enough for the Plaintiffs to prove that Defendant Franklin negligently or even knowingly permitted hazardous conditions to exist, or that it negligently or even willfully failed to furnish the Plaintiffs with a safe place to work, or that it knowingly ordered the Plaintiffs to perform a dangerous job. If, and only if, you find from a preponderance of the credible evidence that Defendant Franklin engaged in conduct designed to cause the injuries for which the Plaintiffs claim damages, may you find for the Plaintiffs. If you find by a preponderance of the credible evidence that the Plaintiffs have failed to prove that Defendant Franklin knowingly exposed them to unreasonably dangerous levels of the industrial solvent which contained [1-BP] with an actual intent to cause them injury, then it is your sworn duty to return a verdict for Defendant Franklin Corporation on each of the Plaintiffs' claims.

Instruction P-2 provides, in part, that:

> [i]n order to establish that an intentional tort was committed by Defendant, Franklin Corporation, Plaintiffs must prove that, more likely than not, Defendant, Franklin Corporation either desired to cause the consequences of its acts, or believed that the consequences were substantially certain to result from it. Said another way, if Franklin Corp. knew that the consequences were certain, or substantially certain, to result from its acts, and still goes ahead, Franklin Corp. is treated by the law as if it had in fact desired to produce the result.

Instruction P-3 states:

> [t]he Court instructs you that with regard to the intentional torts alleged by Plaintiffs against Defendant Franklin Corp., battery and intentional infliction of emotional distress, intent may be inferred from the circumstances of the

37

case. Intent is an emotional operation of the mind, and is usually shown by acts and declarations of the defendant coupled with facts and circumstances surrounding him at the time. A defendant's intention is manifested largely by the things he does.

Instruction P-4A regarding battery provides, in part, that:

if you find by a preponderance of the evidence that Franklin Corp. intended that the Plaintiffs used the glue containing [1-BP], and that Defendant Franklin Corporation knew that Plaintiffs would inhale the vapors/fumes and that such inhalation was known to Franklin Corporation to be causing physical harm to the Plaintiffs, and/or substantially certain to cause physical harm to the Plaintiffs, and that such harmful or offensive contact with the glue vapors/fumes occurred, and that such harmful or offensive contact caused or contributed to cause injury to the Plaintiffs, then it is your duty to return a verdict in favor of the Plaintiffs and against Franklin Corp.

¶48. In reviewing the grant or denial of jury instructions, this Court has stated that:

we are required to review all of the instructions as a whole. *Richardson v. Norfolk & Southern Ry.*, 923 So. 2d 1002, 1010 (Miss. 2006). No instruction should be reviewed in isolation. *Burr v. Miss. Baptist Medical Ctr.*, 909 So. 2d 721, 726 (Miss. 2005). When analyzing the grant or refusal of a jury instruction, two questions should be asked: Does the instruction contain a correct statement of law and is the instruction warranted by the evidence? *Hill v. Dunaway*, 487 So. 2d 807, 809 (Miss. 1986). Defects in specific instructions will not mandate reversal when all of the instructions, taken as a whole fairly – although not perfectly – announce the applicable primary rules of law. *Burton v. Barnett*, 615 So. 2d 580, 583 (Miss. 1993). The above standards notwithstanding, this Court will not hesitate to reverse if the instructions, when analyzed in the aggregate, do not fairly and adequately instruct the jury. *Richardson*, 923 So. 2d at 1011.

*Beverly Enter., Inc. v. Reed*, 961 So. 2d 40, 43 (Miss. 2007).

¶49. We find that the conflict between Instruction D1-2 and Instructions P-2 and P-4A does not rise to the level of reversible error when read in conjunction with the other instructions. Without doubt, the references to "substantially certain" in Instructions P-2 and P-4 were erroneous. The Act is exclusive absent an actual intent to injure the employee. *See* ¶ 31

38

*supra*. However, that phrase was not presented to the jury in isolation, for they also received Instructions D1-2, P-3, and the special interrogatory (Instruction P-10a).

¶50.    Franklin Corporation's Instruction D1-2 includes the appropriate standard.  Had that standard not been furnished to the jury, the outcome which we reach likely would be different.  However, as this Court stated in ***Lamar Hardwood Co. v. Case***, 143 Miss. 277, 107 So. 868 (1926), "[w]e think the law as given to the defendant upon this proposition gives him the benefit of all that he was entitled to have upon the question."  ***Id***. at 289.

¶51.    Instruction P-2, read in its entirety, is a correct statement of the law but for the reference to "substantially certain."  Instruction P-3 is a proper statement of law without flaw.[59]    Finally, a special interrogatory (Instruction P-10a) confirmed that the jury specifically found for each individual Plaintiff on his or her battery and intentional-infliction-of-emotional-distress claims against Franklin Corporation, while exonerating Mid-South.

¶52.    The law requires all instructions to be read together.  *See **id***. at 290 ("the instructions must be taken together and be construed as a whole, one as modifying, explaining or qualifying another; and, if the instructions taken as a whole correctly announce the law applicable to the case, we will not reverse the judgment because of an imperfect single instruction.").  "Where it may be fairly charged that one or more instructions may have been confusingly worded, we should not reverse if other instructions clear up the confusing

_____

[59]Regarding Instruction P-3, Franklin Corporation objected to the language that "intent may be inferred from the circumstances of the case."  The circuit judge overruled that objection, deeming the above-quoted language to be a correct statement of the law.  This Court agrees.  *See **Miss. Bd. of Nursing v. Wilson***, 624 So. 2d 485, 494 (Miss. 1993) (citing ***Hollingsworth v. State***, 392 So. 2d 515 (Miss. 1981)) ("[i]t is well settled that intent may be shown by circumstances.").

points." ***Payne v. Rain Forest Nurseries, Inc.***, 540 So. 2d 35, 40 (Miss. 1989). "Defects in specific instructions do not require reversal 'where all instructions taken as a whole fairly – although not perfectly – announce the applicable primary rules of law.'" ***Burton***, 615 So. 2d at 583 (quoting ***Payne***, 540 So. 2d at 40).

¶53.    We also have held that a conflict between instructions does not justify reversal, given that the evidence overwhelmingly supported the Plaintiffs' claims and does not result in a miscarriage of justice. *See* ***Smith v. Mack Trucks, Inc.***, 819 So. 2d 1258, 1261 (Miss. 2002); ***Smith v. Jones***, 335 So. 2d 896, 897 (Miss. 1976). In short, "[t]he conflict in the evidence made the jury the judges of what the truth was with reference thereto, and we are unable to say that the jury reached the wrong result." ***Case***, 143 Miss. at 289.

> **IV.    Whether the circuit court abused its discretion in permitting the jury to consider punitive damages.**

¶54.    "[T]he primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others . . . ." Miss. Code Ann. § 11-1-65(1)(e) (Rev. 2002). "Punitive damages may not be awarded if the claimant does not prove by *clear and convincing evidence* that the defendant against whom punitive damages are sought acted with *actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud*." Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2002) (emphasis added). *See also* ***Paracelsus Health Care Corp. v. Willard***, 754 So. 2d 437, 442 (Miss. 1999) (citation omitted) ("[p]unitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions are extreme."). "[T]he trial court is the gatekeeper for

40

the issue of whether punitive damages, in cases involving both intentional and non-intentional torts, should be submitted and considered by a jury." ***Doe v. The Salvation Army***, 835 So. 2d 76, 79 (Miss. 2003). "An *abuse of discretion* standard is implemented when this Court reviews the trial court's decision of whether a case warrants punitive damages to be sent to the trier of fact." *Id*. at 81 (citing ***Hurst v. Sw. Miss. Legal Servs. Corp.***, 708 So. 2d 1347, 1351 (Miss. 1998)) (emphasis added).

¶55. According to the circuit judge:

> [t]here's no question that the matters submitted *in this [c]ourt's opinion*, submitted to the jury as to *the burden of proof required in this case for the showing required to avoid . . . the exclusive remedy of Workers' Comp is, in fact, higher than the standard called for in the statute for punitive damages*. There's no good resolution of that, but we just have to act the best we can based on the information we do have.
>
> The [c]ourt finds that in consideration of all the proof that has . . . gone into evidence over the last three weeks that . . . the jury . . . did make an award of compensatory damages; and it was more than a nominal amount of money; and *the [c]ourt believes, based on the proof offered here at this hearing, that it's absolutely appropriate that the jury consider the question of punitive damages . . . .*

(Emphasis added.) In short, the circuit judge found there was sufficient evidence to meet the "clear and convincing" standard required for punitive damages. We find that the circuit court did not abuse its discretion in permitting the jury to consider punitive damages.

>    **V.    Whether the punitive damages assessed in the circuit court's "Amended Final Judgment" were erroneous as a matter of law.**

¶56. The proper assessment of punitive damages under Mississippi Code Section 11-1-65(3) is a question of law, to be reviewed by this Court de novo. *See **Grisham***, 957 So. 2d at 1000.

¶57.   For all actions filed before September 1, 2004,[60] Mississippi Code Section 11-1-65(3)

provided, in pertinent part, that:

> (a) In any civil action where an entitlement to punitive damages shall have
> been established under applicable laws, no award of punitive damages shall
> exceed the following: . . .
>
>> (v) Five Million Dollars ($5,000,000.00)[61] for a defendant with
>> a net worth of more than Fifty Million Dollars ($50,000,000.00)
>> but not more than One Hundred Million Dollars
>> ($100,000,000.00); or
>>
>> (vi) Four percent (4%)[62] of the defendant's net worth for a
>> defendant with a net worth of Fifty Million Dollars
>> ($50,000,000.00) or less.
>
> (b) For the purposes of determining the defendant's net worth in paragraph (a),
> the amount of the net worth shall be determined in accordance with Generally
> Accepted Accounting Principles.

Miss. Code Ann. § 11-1-65(3) (Rev. 2002).

¶58.   Jeffrey Cox, the chief financial officer and general counsel for Franklin Corporation,

testified that the net worth of Franklin Corporation was $45,905,326 in 2003 and

$37,810,166 in 2004. According to Cox, as of December 31, 2006, the net worth of Franklin

Corporation was "approximately [$61,500,000]." He did not believe that figure was

substantially different at the time of trial, and further testified that "Generally Accepted

Accounting Principles" were applied in determining that figure. In the "Order Granting

---

[60]The Complaint in the case *sub judice* was filed on August 16, 2004.

[61]On and after September 1, 2004, this figure became $2,500,000. Miss. Code Ann. § 11-1-65(3)(a)(v) (Rev. 2002).

[62]On and after September 1, 2004, this figure became two percent (2%). Miss. Code Ann. § 11-1-65(3)(a)(vi) (Rev. 2002).

Motion to Reconsider Punitive Damages, to Alter or Amend Final Judgment, for Relief from

Final Judgment, or for Other Relief," the circuit court stated:

> the language of Miss. Code Ann. Section 11-1-65 which relates to the imposition of the legislative caps to a punitive damage award provides that the net worth of the defendant "shall be determined" in accordance with Generally Accepted Accounting Principles, and that *such language implies that the current net worth of the defendant is to be considered*. Further, other portions of the statute refer to the net worth of the defendant as a factor to be considered in an effort to determine the defendant's financial ability to pay the award, and likewise implies that the current net worth of the defendant is to be utilized . . . . Further, there is no language in the statute which provides that the past net worth of the defendant is to be utilized, and without such distinguishing language, *this court must apply the common meaning of the term "net worth," as well as the common interpretation as afforded by a reading of the statute as a whole*.[63]

(Emphasis added.) Applying "the current net worth" of Franklin Corporation, the circuit

court reduced the punitive damages owed to $5,000,000 pursuant to Mississippi Code

Section 11-1-65(3)(a)(v).

¶59. This Court previously has considered the net worth of a defendant *at the time of trial*.

*See **Willard***, 754 So. 2d at 445. *See also **Cash v. Beltmann North American Co.***, 900 F.2d

109, 111 n.3 (7th Cir. 1990) ("[f]inancial data prepared for income tax purposes and four

years old at the time of trial provides weak evidence of Beltmann's true net worth.").

Furthermore, "the primary purpose of punitive damages is to punish the wrongdoer and deter

similar misconduct in the future by the defendant . . . ." Miss. Code Ann. § 11-1-65(1)(e)

---

[63]The circuit judge added that this application furthers the policy behind the imposition of punitive damages, "result[ing] in financial punishment to the defendant in an amount that makes the defendant earnestly consider its actions in the future."

(Rev. 2002). As such, the circuit court's application of the pre-September 2004 version of the statute and Franklin Corporation's net worth *at the time of judgment* was proper.

## CONCLUSION

¶60. Accordingly, this Court affirms the "Amended Final Judgment" of the Circuit Court of Calhoun County.

¶61. **AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, AND PIERCE, JJ.**

**GRAVES, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶62. I fully concur with the majority that the judgment of the trial court must be affirmed. However, I write separately to address the use of the phrase "substantially certain" in the jury instructions.

¶63. The majority finds that the references to "substantially certain" in Instructions P-2 and P-4 were in error.[64] I disagree with the majority inasmuch as the instructions contain a correct statement of the law. The majority cites ***Peaster v. David New Drilling Co.***, 642 So. 2d 344 (Miss. 1994), ***Blailock v. O'Bannon***, 795 So. 2d 533, at 535 (Miss. 2001), and ***Griffin v. Futorian Corp.***, 533 So. 2d 461 (Miss. 1988), in attempting to define "actual intent." However, these cases neither stand for nor support the proposition suggested by the majority. In ***Peaster***, this Court found:

---

[64]Even so, the majority ultimately finds any error to be harmless.

44

In the complaint it was alleged that David New Drilling "willfully" disregarded its duties to Jimmy Wilcoxson, "intentionally" failed to repair the brakes on the tractors and trailers, acted with "gross and reckless disregard for the rights and safety of the public in general and particularly of Plaintiffs' decedent" *and with "knowledge of substantial certainty of injury." Despite these allegations, the overwhelming language and facts point to negligence, including gross negligence*.

*Peaster*, 642 So. 2d at 346 (emphasis added).

¶64. Clearly, the upshot of the *Peaster* decision was that this Court found that Plaintiff Peaster had failed to prove the allegations, which included "knowledge of substantial certainty of injury," and thus had failed to establish "actual intent." There was no discussion or finding in *Peaster* to support the proposition that the "actual intent" exception cannot and does not include "knowledge of substantial certainty of injury." Moreover, the majority's discussion of *Griffin* likewise fails to support this proposition. In *Peaster,* this Court quoted the following from *Griffin*:

> Dunn, Mississippi Workmen's Compensation, (3d ed. 1982 & Supp. 1984), notes that in order for a willful tort to be outside the exclusivity of the Act, the employee's [sic] action must be done "with an actual intent to injure the employee. It is not enough to destroy the immunity that the employer's conduct leading to the injury consists of aggravated negligence or even that the conduct goes beyond this to include such elements as knowingly permitting hazardous conditions to exist or willfully failing to furnish a safe place to work or knowingly ordering the employee to perform a dangerous job."

*Peaster*, 642 So. 2d at 347 (quoting *Griffin*, 533 So. 2d at 464). This Court further said:

> Griffin [sic] absolutely bars an intentional tort claim even where the probability of gross negligence exists. Thus, in the case sub judice, even if the appellants could prove that David New Drilling was guilty of gross negligence, such a finding would remain insufficient to create an intentional tort and accordingly remove the appellants' claim from under the Workmens' [sic] Compensation Act. A mere willful and malicious act remains insufficient to give rise to the exception under the Act.

45

*Id.* at 348.

¶65.    Notably, in discussing *Peaster's* assertion that this Court recognize a substantially-certain exception and apply the Restatement definition of intent, this Court found that:

> ***What the appellants propose is not particularly new or inconsistent with the previous decisions of this Court. As noted, this Court has previously considered the Restatement's interpretation of intent. The problem is that the allegations of the complaint and all evidence before the lower court fall far short of the substantial certainty which is required.***

*Id.* at 349 (emphasis added).

¶66.    Further, Black's Law Dictionary defines "intentionally" as follows, in relevant part: "To do something purposely, and not accidentally . . . . Person acts 'intentionally' if he desires to cause consequences of his act or he ***believes consequences are substantially certain to result*** . . . ." Black's Law Dictionary 810 (6th ed. 1990) (citation omitted) (emphasis added). Black's defines "actual" as: "Real; ***substantial***; existing presently in fact; having a valid objective existence as opposed to that which is merely theoretical or possible . . . ." Black's Law Dictionary at 34 (emphasis added). Black's also notes the following in the definition of "intent": "The word 'intent' is used throughout the Restatement of Torts, 2nd, to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are ***substantially certain*** to result from it . . . ." Black's Law Dictionary at 810 (emphasis added).

¶67.    Therefore, I would find that there is no error in including substantially-certain language in the jury instructions along with language of actual intent.

**DICKINSON, JUSTICE, SPECIALLY CONCURRING**:

¶68. Although I concur with the majority, I write separately to address two points.

**I.**

¶69. The majority correctly holds that – absent an actual intent to injure the employee – the "exclusive-remedy" provisions of the Mississippi Workers Compensation Act (the "Act") apply to injuries inflicted by employers upon employees. The vast majority of states, including Mississippi, hold this view, even where the employer's conduct is substantially certain to result in injury. 6 Arthur Larson, Larson's Workers' Compensation Law §103.03 (2008).

> [T]he common-law liability of the employer cannot under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury.

*Id*. (footnotes omitted). Although thirty-eight jurisdictions (including Mississippi) "follow the rule that actual intent to injure is necessary to come outside of the exclusivity provision," twelve states disagree. Thus, "in recent years there has been a trend toward permitting common law suits when the injury is the result of actions the employer knew were 'substantially certain' to cause injury. About a dozen states[65] now follow this or a similar rule." Larson's § 103.03 n.1. However, our precedent holds that:

> [i]t is not enough to destroy [Workers Compensation] immunity that the employer's conduct leading to the injury consists of . . . knowingly permitting hazardous conditions to exist or willfully failing to furnish a safe place to work

---

[65]Connecticut, Louisiana, New Jersey, North Carolina, Ohio, Oklahoma, South Dakota, Texas, California, Michigan, Washington, and West Virginia.

or knowingly ordering the employee to perform a dangerous job . . . .   This Court has held repeatedly that the employer's action must be done with an actual intent to injure the employee, and that "an intentional tort is an act of intentional behavior designed to bring about the injury."

*Peaster v. David New Drilling Co.*, 642 So. 2d 344 (Miss. 1994) (internal citations omitted).

¶70.   In 1988, this Court reviewed an injured worker's argument that the Court should "recognize that the injuries sustained by him constitute a new tort outside the exclusivity rule of the [Act]." *Griffin v. Futorian Corp.*, 533 So. 2d 461, 463 (Miss. 1988).  Speaking for a unanimous Court, Chief Justice Roy Noble Lee stated that "[s]ome states have amended their worker's compensation acts to make exceptions to the exclusive remedy.  Mississippi's act has not been amended in that respect since its passage." *Id*. at 463.  Recognizing (as the majority does today) that an actual intent and design to injure is necessary, the *Griffin* Court cited with approval the following authority:

> [I]n order for a willful tort to be outside the exclusivity of the Act, the [employer's] action must be done "with an actual intent to injure the employee. It is not enough to destroy the immunity that the employer's conduct leading to the injury consists of aggravated negligence or even that the conduct goes beyond this to include such elements as knowingly permitting hazardous conditions to exist or willfully failing to furnish a safe place to work or knowingly ordering the employee to perform a dangerous job."

*Griffin v. Futorian Corp.*, 533 So. 2d at 464 (citing Dunn, Mississippi Workmen's Compensation (3d ed. 1982 & Supp. 1984)) (emphasis added).[66]  It is of some significance

---

[66]The above quoted language from *Dunn* is correct.  However, the *Griffin* Court mistakenly indicated that the "employee's" act, rather than the employer's act, must be done with actual intent to injure.  Thus, the *Griffin* Court included a typographical error.  We therefore now make the correction.

that – since *Griffin* was handed down some twenty years ago – the Legislature has taken no action to address or contradict its holding.

¶71. Thus, absent the employer's deliberate intent and design to injure the employee, the law in Mississippi – as it currently exists – does not allow an injured employee to escape the exclusive-remedy provisions of the Act. The law on this point is so clear that discussion of the contrary view is unnecessary. And upon this point, I fully concur with the majority.

## II.

¶72. Another point I believe important concerns the procedure for presenting to the trial court an assertion that the Act provides a plaintiff's exclusive remedy. As a matter of procedure, in order to preserve the issue for appeal, a defendant should raise the matter in the first instance as an affirmative defense or (as in the case before us today) in a motion to dismiss. The converse is also true, that is, the plaintiff has no duty to raise or argue the issue.

¶73. Black's Law Dictionary defines an affirmative defense as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." Black's Law Dictionary 356 (8th ed. 2005). Franklin's position is that – even though everything the plaintiffs say in this lawsuit may be true – it is nonetheless entitled to dismissal from this civil suit, because the Act provides the plaintiffs' exclusive remedy.

¶74. As stated, in the case before us, Franklin raised the question by motion to dismiss, and the trial judge denied the motion, finding that the issue involved a question of fact. Thus, Franklin properly preserved the issue for appeal.

¶75.   Furthermore, a defendant seeking to escape tort liability via an affirmative defense has the additional duty to seek a jury instruction for that affirmative defense which places the burden of proof (as to the affirmative defense) squarely upon the defendant.  *See **Natchez Elec. & Supply Co., Inc. v. Johnson***, 968 So. 2d 358, 361 (Miss. 2007) ("The burden of proving an affirmative defense lies upon the party who relies upon that defense." (*citing **Jenkins v. Pensacola Health Trust, Inc.***, 933 So. 2d 923, 927 (Miss. 2006))).

¶76.   Franklin argues that the jury instructions were contradictory and did not properly instruct the jury on its affirmative defense.  The instructions which were given address the plaintiffs' burden of proof in establishing the causes of action pending before the circuit court.  The instructions (recited in the majority opinion) addressing those causes of action were, in my judgment, correct.  The fact that the jury was not instructed exactly as Franklin thinks it should have been should not be viewed as error on the part of the plaintiffs, who had no duty to offer an instruction from Franklin's perspective.

¶77.   That said, under the facts of this case (as discussed by the majority), any additional instruction offered by Franklin wouldn't have affected the outcome anyway.  But in the interest of completeness, I offer this analysis which I believe to be complementary – rather than contrary – to the majority.

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

50